*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0025p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

MARTINIQUE STOUDEMIRE,

*Plaintiff-Appellee,*

v.

No. 11-1588

MICHIGAN DEPARTMENT OF CORRECTIONS, et al.

*Defendants,*

SUSAN DAVIS, Warden, Huron Valley
Women's Facility; ARIEL N. DUNAGAN,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:07-cv-15387—Julian A. Cook, Jr., District Judge.

Argued: May 29, 2012

Decided and Filed: January 31, 2013

Before: BOGGS and COLE, Circuit Judges; and OLIVER, Chief District Judge.[*]

_____

## COUNSEL

**ARGUED:** Clifton B. Schneider, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants. Elizabeth Alexander, LAW OFFICES OF ELIZABETH ALEXANDER, Washington, D.C., for Appellee. **ON BRIEF:** Clifton B. Schneider, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants. Elizabeth Alexander, LAW OFFICES OF ELIZABETH ALEXANDER, Washington, D.C., Patricia A. Streeter, Ann Arbor, Michigan, for Appellee.

_____

[*] The Honorable Solomon Oliver, Jr., Chief United States District Judge for the Northern District of Ohio, sitting by designation.

———————————

**OPINION**

———————————

SOLOMON OLIVER, JR., Chief District Judge.  Plaintiff-Appellee Martinique Stoudemire ("Plaintiff" or "Stoudemire"), a double amputee and former prisoner at Huron Valley Women's Correctional Facility ("Huron") in Ypsilanti, Michigan, brought the instant case against the Michigan Department of Corrections ("MDOC") and MDOC-associated officers, doctors, and nurses, asserting violations of 42 U.S.C. § 1983; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; and Mich. Comp. Laws § 330.1722. Stoudemire, who has suffered from autoimmune and kidney disorders since she was a youth, alleges that, while she was an inmate at Huron, she underwent three separate amputations as a result of inadequate health care by the Defendants, was placed in a segregation unit immediately following her final amputation that lacked accommodations for disabled persons, and was subjected to a strip search that served no legitimate penological purpose.  Defendant-Appellants Susan Davis ("Davis"), the warden who allegedly sanctioned Stoudemire's placement in segregation, and Ariel N. Dunagan ("Dunagan"), the corrections officer who conducted the strip search, appeal from the order of the district court denying them summary judgment on their qualified immunity defenses to Stoudemire's § 1983 claims against them.[1] *Stoudemire v. Mich. Dep't of Corr.*, No. 07-15387, 2011 WL 1303418 (E.D. Mich. Mar. 31, 2011).  The district court did not resolve Stoudemire's state law claims; Davis and Dunagan reassert their governmental immunity defense to those claims.  For the following reasons, we VACATE the denial of qualified immunity as to Davis, AFFIRM the denial of qualified immunity as to Dunagan, and REMAND with instructions for the district court to address Davis's qualified immunity defense and Davis's and Dunagan's state law defenses in a manner not inconsistent with this Opinion.

———————————

[1]The other Defendants who were initially named as appellants moved to be dismissed from this appeal and were dismissed by order of this court on December 4, 2012.

## I.  JURISDICTION AND STANDARD OF REVIEW

Pursuant to the "collateral order" doctrine, we have jurisdiction under 28 U.S.C. § 1291 to review the district court's interlocutory denial of qualified immunity only to the extent that it turns on an issue of law.  *Mitchell v. Forsyth*, 472 U.S. 511, 529-30 (1985).  The district court's characterization of the basis for its ruling is not dispositive. *See Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 402-03 (6th Cir. 2007).  Thus, our jurisdiction is not necessarily defeated by the fact that the district court denied a defendant's motion for summary judgment on the ground that there is a genuine issue of material fact.  *Id.* at 402.  In such a case, we may nevertheless exercise appellate jurisdiction over  purely legal questions related to qualified immunity.  *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996).  This is so even where the defendant impermissibly relies on disputed facts on appeal; "this court can ignore the defendant's attempts to dispute the facts and nonetheless resolve the legal issue [raised], obviating the need to dismiss the entire appeal for lack of jurisdiction."  *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005); *see also Thompson v. Grida*, 656 F.3d 365, 367 (6th Cir. 2011) (explaining that a defendant appealing denial of summary judgment on qualified immunity grounds must be willing to concede the most favorable view of the facts to the plaintiff).  However, "[m]ere conclusory statements that the officers construe the facts in the light most favorable to the plaintiff cannot confer jurisdiction upon this Court."  *Thompson*, 656 F.3d at 368.

We review de novo a district court's denial of a defendant's motion for summary judgment on qualified immunity grounds.  *See  Tucker v. City of Richmond*, 388 F.3d 216, 219 (6th Cir. 2004).  We also review de novo the question of whether a defendant is entitled to governmental immunity under Michigan law.  *Reilly v. Vadlamudi*, 680 F.3d 617, 622 (6th Cir. 2012) (citing *Herman v. City of Detroit*, 680 N.W.2d 71, 74 (Mich. Ct. App. 2004)).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   We determine  materiality  by  reference  to  the  applicable

substantive law, and thus "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not appropriate "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also* Fed. R. Civ. P. 56(c). In reviewing a summary judgment motion, we view all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 378 (2007). In the qualified immunity context, "this usually means adopting . . . the plaintiff's version of the facts," *id.*, unless the plaintiff's version is "blatantly contradicted by the record, so that no reasonable jury could believe it . . . ." *Id.* at 380.

## II. FACTUAL BACKGROUND

### A. Stoudemire's Medical History

When twenty-three-year-old Martinique Stoudemire entered the MDOC system in July 2002, she came with a long and well-documented history of health problems. Stoudemire suffered from systemic lupus erythematosus, a chronic and painful autoimmune disease; hypercoagulapathy, a related disorder characterized by a tendency to develop blood clots; and depression. Without proper care, Stoudemire bore a significant risk of experiencing kidney and liver damage, heart attacks, amputations, and chronic pain.

Stoudemire's health quickly deteriorated. During her five years at Huron, she experienced a heart attack, liver failure, and a number of life-threatening embolisms. She underwent three amputations, eventually losing both legs below the knee. By the time of her parole in August of 2007, she also suffered from chronic depression, post-traumatic stress disorder, and a number of conditions related to medications she had received during her incarceration. Stoudemire attributes her health complications to the alleged failure of MDOC staff members and associated doctors and nurses to provide her with adequate health care while she was incarcerated. For the purposes of this appeal,

however, we focus on the events following Stoudemire's final amputation in December 2006, when her stump and buttock became infected with Methicillin-resistant Staphylococcus Aureas ("MRSA") and she was quarantined in Huron's segregation unit.

### B. Stoudemire's Placement in Huron's Segregation Unit

According to an April 14, 2005, Memorandum from Richard D. Russell, Administrator of the MDOC Health Care Bureau, "all prisoners with a documented culture positive for MRSA must be quarantined." The policy provides that responsible staff members must notify the warden of the particular facility of a confirmed MRSA case in order to initiate the quarantine process. If health care staff determine that medical quarantine is necessary, the warden is responsible for isolating the infected inmates. The warden has the discretion to choose a quarantine location within the prison and may also opt to send infected inmates to another site. Davis designated Huron's segregation unit, which prisoners and guards call "the hole," as a quarantine location. The segregation unit is normally used for isolating prisoners who have violated prison rules.

Stoudemire spent roughly two weeks in quarantine as a consequence of her MRSA infection. At her deposition, Davis testified that she "was probably aware at the time" that Stoudemire had been placed in segregation for medical purposes but that she "[didn't] recall specifically."

Stoudemire alleges that she received extremely poor medical care while in segregation. The segregation cells were not equipped to accommodate disabled patients. Stoudemire was never provided with any assistive devices that might have allowed her to safely move between her bed, wheelchair, toilet, and shower. There was no call button, so Stoudemire had to shout when she needed assistance. She alleges that the medical staff treated her with contempt. They accused her of malingering and responded with hostility whenever she sought assistance. As a result, Stoudemire was left to care for herself. She was forced to crawl from her bed to the toilet. On one occasion, she had to urinate into a bowl. On another occasion, she defecated on herself. The staff neglected Stoudemire's hygiene. She received only one shower during her two weeks

in segregation and was required to dress her wounds herself, which put her at risk of infection.

According to one of Plaintiff's experts, Stoudemire received "very little medical rounding" while she was in the segregation unit, which was "a terrible place to put an amputee." Davis testified that, in cases where a physically handicapped prisoner was placed in a segregation cell, she "would check the logbook to make sure that medical professionals had been through at least daily to see the prisoner for however often the prisoner's particular need was." Davis also testified that she would "check to make sure that my deputy warden or [an assistant deputy warden] had been through . . . [and] personally observed that prisoner to make sure that, you know, they weren't hanging themselves in the cell or what have you."

### C. The Strip Search by Officer Dunagan

Stoudemire also challenges the constitutionality of a February 10, 2007, strip search performed by Officer Dunagan. Stoudemire's account is as follows: Stoudemire was in the infirmary's common area, waiting to be escorted to an aerobics class. Dunagan approached and announced her intention to conduct a strip search. When Stoudemire asked Dunagan for a reason for the search, Dunagan said, "[b]ecause I can." Dunagan took Stoudemire to Stoudemire's cell. Dunagan did not cover the window on the cell door, which looked out onto a busy hallway. Dunagan and Stoudemire were positioned so that passers-by had an unobstructed view of Stoudemire. Dunagan "displayed pleasure at [Stoudemire's] discomfort," smirking throughout the search. Stoudemire stripped down to her underpants and removed her prosthetic legs. She could hear people in the hallway and realized that they could see her. She felt humiliated. Dunagan did not find any contraband.

Dunagan offers a markedly different account of the search. According to Dunagan, she asked Stoudemire to submit to a pat-down search rather than a strip search. Stoudemire "refused and sped off in her wheelchair to her room, saying that she had to change her shirt before I [did] my pat-down search." Dunagan followed Stoudemire to

her cell and decided to conduct a strip search because Stoudemire had tried to evade the pat-down search. Dunagan did not cover the cell-door window, but she did position herself between the window and Stoudemire, thereby blocking passers-by from seeing Stoudemire. Stoudemire stripped down to her brassiere and underpants. Dunagan discovered a cigarette and matches–contraband items–in Stoudemire's hand. She issued Stoudemire a misconduct ticket.

Some facts are not in dispute. The day after the search, Stoudemire filed a grievance, alleging that Dunagan's conduct constituted sexual harassment. The grievance was denied, but Dunagan received an official reprimand for conducting the search in violation of MDOC Policy Directive 4.04.110 ¶ U, which states that "[a] strip search shall be conducted in a place which prevents the search from being observed by those not assisting in that search . . . ." The reprimand notes that other persons could have observed Stoudemire during the search because Dunagan did not block the window on the door, and that Dunagan admitted that such "visual contact" was possible. In addition, MDOC Policy Directive 4.07.112 ¶ GG requires that, when an officer finds contraband, the contraband must be confiscated and a contraband removal record must be issued to the prisoner, as well as either a misconduct report or a notice of intent to conduct an administrative hearing. The record does not contain copies of any such documents.

## III. ANALYSIS

### A. Section 1983 and Qualified Immunity

Section 1983 provides "a cause of action for deprivation under color of state law, of any rights, privileges or immunities secured by the Constitution or laws of the United States." *Jones v. Muskegon Cnty.*, 625 F.3d 935, 940-41 (6th Cir. 2010) (internal quotation marks and citation omitted). However, "[u]nder the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

known.'" *Phillips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In resolving a government official's qualified immunity claims, we look to whether (1) the facts that the plaintiff has alleged or shown establish the violation of a constitutional right, and (2) the right at issue was "clearly established" at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). This court has discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

In evaluating whether a constitutional right was clearly established, "[t]he key determination is whether a defendant moving for summary judgment on qualified immunity grounds was on notice that his alleged actions were unconstitutional." *Grawey v. Drury*, 567 F.3d 302, 313 (6th Cir. 2009). The Supreme Court has stressed that the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). This does not mean that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." *Id.* (citing *Mitchell*, 472 U.S. at 535 n.12). Rather, it means that "in light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640 (collecting cases); *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."). This court has explained that a plaintiff has "two paths for showing that officers were on notice that they were violating a 'clearly established' constitutional right—where the violation was sufficiently obvious under the general standards of constitutional care that the plaintiff need not show a body of materially similar case law, . . . and where the violation is shown by the failure to adhere to a particularized body of precedent that squarely governs the case here." *Lyons v. City of Xenia*, 417 F.3d 565, 579 (6th Cir. 2005) (citing *Brosseau v. Haugen*, 543 U.S. 194, 198-200 (2004)) (internal quotation marks omitted). In other words, the "clearly established" prong must be applied "in light of the specific context of the case, not as a broad general proposition."

*Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson*, 555 U.S. at 236.

A defendant bears the initial burden of putting forth facts that suggest that he was acting within the scope of his discretionary authority. *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992). Ultimately, however, the "burden of proof is on the plaintiff to show that the defendants are not entitled to qualified immunity." *Id.*

### B. The Davis Appeal

Stoudemire alleges that the conditions of her confinement while in quarantine violated her Eighth Amendment right to be free from cruel and unusual punishment. The Eighth Amendment protects inmates by "impos[ing] duties on [prison] officials, who must provide humane conditions of confinement" and "adequate food, clothing, shelter, and medical care and . . . 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-527 (1984)). However, "[a]n inmate may bring a § 1983 claim under the Eighth Amendment only where he can show that a state official acted with 'deliberate indifference' to his 'medical needs.'" *Gibson v. Moskowitz*, 523 F.3d 657, 661 (6th Cir. 2008) (quoting *Clark-Murphy v. Foreback*, 439 F.3d 280, 286 (6th Cir. 2006)). Deliberate indifference requires more than a showing of "mere mistreatment or negligence." *Id.* As the Supreme Court has explained,

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference.

*Farmer*, 511 U.S. at 837. On appeal, Davis argues that the district court erred in denying her qualified immunity on Stoudemire's Eighth Amendment conditions of confinement claim under § 1983 because Stoudemire did not show that Davis was deliberately indifferent to Stoudemire's medical needs.

The district court found that,

> when viewing the facts in a light most favorable to Stoudemire, the evidence supports her argument (i.e., she suffered from a medical condition in the form of a double amputation and immediate infection, for which the MDOC Defendants failed to reasonably accommodate by providing her with (1) assistive facilities, (2) training on how to care for herself, and (3) other aids that would assist her in meeting her basic health and safety needs).

*Stoudemire*, 2011 WL 1303418, at *8. The court also found that "the MDOC Defendants neglected to make any reasonable adjustments for her as a brand-new double amputee who could not ambulate within her segregated cell without the assistance of another person." *Id.* The court then concluded that Stoudemire had "sufficiently alleged the violation of a clearly established right." *Id.* As a result of a series of stipulations and Stoudemire's decision not to challenge a portion of the Defendant's motion to dismiss, Stoudemire had effectively withdrawn her Eighth Amendment claim (arising from her quarantine) against all but Davis; in a footnote, the district court noted that "the analysis by the court applies only to Davis." *Id.* at *8 n.7. Nonetheless, the district court denied qualified immunity for the "Defendants." The court also denied Defendants' motion for summary judgment on Stoudemire's ADA claim.

### 1. Issues Regarding Whether Claim Properly Before the Court

Davis and Stoudemire both argue that we cannot consider the merits of Stoudemire's Eighth Amendment claim. According to Davis, Stoudemire never actually pleaded such a claim; instead, the district court improperly "created" an Eighth Amendment claim by relying on the facts Stoudemire alleged solely in support of her ADA claim. Stoudemire argues that Davis failed to raise qualified immunity as a defense to Stoudemire's Eighth Amendment claim and that the court therefore lacks jurisdiction over Davis's appeal. *See Mingus v. Butler*, 591 F.3d 474, 483-84 (6th Cir. 2010) (declining to address defendant's assertion of qualified immunity where the defense was not initially presented to the court). We review de novo whether a given set of pleaded facts supports a claim. *See*, *e.g.*, *Carter v. Ford Motor Co.*, 561 F.3d 562,

565-66 (6th Cir. 2009).  We also review de novo whether a given set of facts constitutes waiver.  *See Karam v. Sagemark Consulting, Inc.*, 383 F.3d 421, 426 (6th Cir. 2004).

We reject Davis's contention that the district court conflated or "confused" Stoudemire's ADA claim with her Eighth Amendment claim.  The district court correctly stated that Stoudemire's Eighth Amendment claim was based on "the same misconduct which gives rise to her claims under the ADA." *Stoudemire*, 2011 WL 1303418, at *8.  The court found that "the claimed misconduct . . . if true, supports independent causes of action under Title II [of the ADA] and the Eighth Amendment." *Id.* at *6.  Clearly, the district court was not "confuse[d]," and did not conflate the ADA claim with the Eighth Amendment claim, as Davis argues.  Rather, the district court properly construed Stoudemire's Complaint "so as to do justice."  Fed. R. Civ. P. 8(e); *see also Minger v. Green*, 239 F.3d 793, 799 ("[T]he Rules require that we not rely solely on labels in a complaint, but that we probe deeper and examine the substance of the complaint.").

We also reject Stoudemire's contention that Davis did not raise qualified immunity as a defense.  Stoudemire's argument rests entirely on the following sentence in Defendants' motion before the district court: "Had the plaintiff alleged this as a constitutional violation, the defendants would respond that they are entitled to qualified immunity because clearly established law does not prohibit quarantining a prisoner to protect the prison population from infection."  The sentence must be read in the context of the paragraph, which begins: "As to the remainder of the claims, the defendants are also entitled to qualified immunity and summary judgment."  Taken together, these sentences clearly suffice as an assertion of qualified immunity.  In addition, we have previously declined to dismiss interlocutory appeals on waiver grounds where the district court made no findings of waiver, and we decline to do so here.  *See, e.g.*, *Yates v. City of Cleveland*, 941 F.2d 444, 449 (6th Cir. 1991) (declining to dispose of appeal on waiver grounds where district court "made no findings of . . . waiver" regarding qualified immunity defense); *Taylor v. Mich. Dep't of Corr.*, 14 F.3d 602, *2 (6th Cir.1993) (declining to address waiver issue that was not addressed by the district court, even

though "sloppy draftsmanship" in summary judgment brief brought defendant "dangerously close" to waiving defense).

### 2. Discussion of Davis's Qualified Immunity Defense

Although we have jurisdiction to consider Davis's qualified immunity defense, "it is well-settled that qualified immunity must be assessed in the context of each individual's specific conduct." *Reilly*, 680 F.3d at 624; *see also Bishop v. Hackel*, 636 F.3d 757, 767 (6th Cir. 2011) (holding that district court erred in failing to make individualized assessment for purposes of subjective component under *Farmer*); *Phillips*, 534 F.3d at 542 ("Where, as here, the district court is faced with multiple defendants asserting qualified immunity defenses, the court should consider whether each individual defendant had a sufficiently culpable state of mind."). Accordingly, the question of whether an official possessed the requisite knowledge and culpable mental state to sustain a deliberate indifference claim "must be addressed for each officer individually." *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005).

In order to be liable in this case, Davis must have "both be[en] aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [s]he must also [have] draw[n that] inference." *Farmer*, 511 U.S. at 837. Though the district court stated in a footnote that its ruling only applied to Davis, since the Plaintiff by stipulation or otherwise had conceded its claims against the other defendants, as stated above, it denied qualified immunity for "Defendants." In so doing, the court did not conduct a particularized analysis of whether Davis was deliberately indifferent to the conditions of Stoudemire's confinement while in quarantine. The district court did not mention any facts in the record that specifically pertained to Davis, nor did the court make any findings regarding Davis's knowledge or mental state. Even if we were to assume that the district court's analysis satisfactorily addressed the objective element of Stoudemire's Eighth Amendment claim–"the existence of a sufficiently serious medical need," *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)–clearly there was no discussion of the subjective element of the claim: whether Davis, the warden, had "a

sufficiently culpable state of mind in denying [Stoudemire] medical care." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004).

Although this court has the authority to "undertake a cumbersome review of the record to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed," *Johnson v. Jones*, 515 U.S. 304, 319 (1995), the best course is to remand "for the district court to set forth with precision the basis for its decision." *Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir. 1988), *cert. denied*, 109 S. Ct. 788 (1989); *see also Crutcher v. Kentucky*, 883 F.2d 502, 503 (6th Cir. 1989); *Dominque v. Telb*, 831 F.2d 673, 677 (6th Cir. 1987). We therefore vacate and remand to the district court for the purpose of properly evaluating Davis's qualified immunity defense.

### C. Dunagan's Appeal

Dunagan appeals the district court's denial of qualified immunity in regard to Stoudemire's § 1983 claim relating to the 2007 strip search. In contrast to its resolution of Davis's qualified immunity defense, the district court addressed Dunagan's defense with sufficient particularity to enable our review. Viewing the record in the light most favorable to Stoudemire, the district court held that "Dunagan should have been on notice that [the strip search] would have been unreasonable under the circumstances and not based on a reasonable penological interest of security and order." *Stoudemire*, 2011 WL 1303418, at *9. On appeal, Dunagan argues that Stoudemire has failed to "show that there is clearly established law prohibiting the conduct in question," emphasizing that Stoudemire has presented no case holding that a same-sex strip search of a prisoner was unlawful. Stoudemire's alleged injury, however, is not tied to Dunagan's gender. Rather, Stoudemire's focus is on evidence that suggests that the search was "undertaken to harass or humiliate" and not for any legitimate purpose. According to Stoudemire, the relevant constitutional question is not whether clearly established law proscribes same-sex strip searches in prisons, but whether clearly established law proscribes a strip search that served no legitimate penological purpose and was intended only to harass. Dunagan focuses on whether the law regarding same-sex strip searches is "clearly established" for qualified immunity purposes. However,

the applicable inquiry is whether the strip search was reasonable under the circumstances and whether Stoudemire's constitutional rights in this regard were clearly established at the time of the search.  We address both issues.

## 1. Constitutional Violation

Because "the difficulties of operating a [prison] must not be underestimated by the courts," *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 132 S. Ct. 1510, 1515 (2012), we review a prisoner's constitutional claims under a standard that affords deference to the judgments of correctional officers, "who must have substantial discretion to devise reasonable solutions to the problems they face." *Id.*; *see also Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001).  A prison's regulations need only be "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).  We review a correctional officer's discretionary actions under essentially the same deferential standard. *Florence*, 132 S. Ct. at 1516.  But we must not confuse deference with abdication: "[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates." *Turner*, 482 U.S. at 84.  As we have noted, "a convicted prisoner maintains some reasonable expectations of privacy while in prison . . . even though those privacy rights may be less than those enjoyed by non-prisoners." *Cornwell v. Dahlberg*,  963 F.2d 912, 916 (6th Cir. 1992); *see also Hutchins v. McDaniels*, 512 F.3d 193, 196 (5th Cir. 2007) ("[T]he Fourth Amendment protects prisoners from searches and seizures that go beyond legitimate penological interests.  Searches of prisoners must be conducted in a manner that is reasonable under the facts and circumstances in which they are performed." (internal citation omitted)).[2]  The

---

[2]Dunagan cites *Hudson v. Palmer*, 468 U.S. 517 (1984), for the proposition that "prisoners have no Fourth Amendment right to privacy."  Dunagan misapprehends the scope of the Supreme Court's decision.  In *Hudson*, the Court "addressed the question of whether prison officials could perform random searches of inmate *lockers and cells* even without reason to suspect a particular individual of concealing a prohibited item." *Florence*, 132 S. Ct. at 1516 (emphasis added).  The Court held that "society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his *prison cell*." *Hudson*, 468 U.S. at 526 (emphasis added). *Hudson* stands for the proposition that "prisoners have no reasonable expectation of privacy protecting their *cells* from unreasonable searches." *Kent v. Johnson*, 821 F.2d 1220, 1226 (6th Cir. 1987) (emphasis added).  Our cases have long made clear that that "a convicted prisoner maintains some reasonable expectations of privacy while in prison," and that *Hudson* did not extinguish a prisoner's Fourth Amendment right to bodily privacy. *Cornwell*, 963 F.2d at 916 (6th Cir. 1992); *see also, e.g.*, *Everson v. Mich. Dept. of Corr.*, 391 F.3d 737, 757 (6th Cir. 2004).

Supreme Court instructs us that, where a prisoner alleges a constitutionally unreasonable search,

> [t]he test of reasonableness under the Fourth Amendment . . . requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Bell v. Wolfish*, 441 U.S. 520, 559 (1979). Accordingly, we first examine the scope, manner, and location of the search–as well as the justification for initiating it–in order to assess the degree to which it invaded the prisoner's right to privacy. We next evaluate the need for the search, giving due deference to the correctional officer's exercise of her discretionary functions. Finally, we determine whether the search was reasonably related to legitimate penological interests by weighing the need against the invasion. *Florence*, 132 S. Ct. at 1516. Because Stoudemire's account of the search has not been "blatantly contradicted by the record, so that no reasonable jury could believe it," *Scott*, 550 U.S. at 380, the procedural posture of this appeal requires us to accept Stoudemire's version of the events.

(a)  Degree of Invasion of Personal Rights

The scope of the search frames our analysis of the other *Bell* factors. Had Dunagan conducted a pat-down search or a search of Stoudemire's room, it is doubtful that her actions would rise to the level of a constitutional violation. However, "a strip search, by its very nature, constitutes an extreme intrusion upon personal privacy, as well as an offense to the dignity of the individual." *Wood v. Clemons*, 89 F.3d 922, 928 (1st Cir. 1996). It is a practice that "instinctively gives us . . . pause," *Bell*, 441 U.S. at 558, since "[u]ndergoing such an inspection is undoubtedly humiliating and deeply offensive to many . . . ." *Florence*, 132 S. Ct. at 1524 (Alito, J., concurring). To the extent that prisoners have some right, however diminished, "to be secure in their persons . . . against unreasonable searches," U.S. Const. amend IV, a strip search is a particularly extreme invasion of that right. *Bell*, 441 U.S. at 559-60. The facts of Dunagan's strip search of Stoudemire tell us as much.

The location of the strip search made it more invasive. Because Dunagan did not block the window of the cell, the search did not take place in a private location; as Dunagan admitted, people in the hall could see Stoudemire naked, her prosthetic legs removed. *Cf. Dufrin v. Spreen*, 712 F.2d 1084, 1089 (6th Cir. 1983) (finding strip search that "was carried out discreetly and in privacy" to be unobtrusive). Dunagan received a reprimand for her failure to conduct the strip search "in a place which prevent[ed] the search from being observed by those not assisting in that search," in violation of the MDOC's rules. The MDOC rule and Dunagan's reprimand underscore the obvious: a strip search is more invasive when it is performed where other people can see the person being stripped.[3] *See, e.g.*, *Amaechi v. West*, 237 F.3d 356, 364 (4th Cir. 2001); *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 129 (7th Cir. 1982).

Dunagan's manner also made the search somewhat more invasive. Stoudemire highlights two facts in this regard: that Dunagan refused to tell Stoudemire her reasons for initiating the search and that Dunagan smirked during the search. Although these facts are hardly dispositive, s*ee Roden v. Sowders*, 84 F. App'x 611, 613 (6th Cir. 2003) ("Even if [the defendant prison guard] did laugh, the strip search is not rendered constitutionally invalid thereby."), they may, in context, suggest personal animus and implicate the dignitary interest "inherent in the privacy component of the Fourth Amendment's proscription against unreasonable searches." *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 499 (6th Cir. 2008).

### (b)  The Degree of Need for the Search

Our next step is to evaluate the need for the particular search. *Bell*, 441 U.S. at 559. Unquestionably, "detect[ing] and deter[ring] the possession of contraband" is a legitimate penological objective. *Florence*, 132 S. Ct. at 1517. Absent proof to the contrary, we must assume that a search of a prisoner is initiated in an effort to detect and deter contraband. *See Hudson*, 468 U.S. at 529 (quoting *Marrero v. Commonwealth*, 284 S.E.2d 809, 811 (Va. 1981)) ("For one to advocate that prison searches must be

---

[3]We note that prisoners enjoy no special privacy rights in their cells. *See Hudson*, 468 U.S. at 526; *United States v. Smith*, 526 F. 3d 306, 309 (6th Cir. 2008). Our focus, however, is not on the type of room but on the degree of privacy the location actually provided during the search.

conducted only . . . when suspicion is directed at a particular inmate is to ignore the realities of prison operation."). But to say that Dunagan had a legitimate justification for searching, or even strip searching, Stoudemire does not conclude our inquiry. We must further determine "the need for the *particular* search" at issue. *Bell*, 441 U.S. at 559 (emphasis added).

The question, then, is whether any exigent circumstances compelled Dunagan to strip search Stoudemire in view of other inmates and prison personnel. The record suggests no such exigencies. As Dunagan's reprimand shows, no emergency made such a search necessary. *Cf.*, *Cookish v. Powell*, 945 F.2d 441, 448-49 (1st Cir. 1991) (holding that visual body cavity searches, some of which were conducted in view of guards of the opposite sex, did not violate clearly established rights where searches were conducted in response to what plaintiff conceded was a "riot" situation). There is no evidence that Dunagan chose the search location out of concern for Dunagan's own safety. *Cf. Michenfelder v. Sumner*, 860 F.2d 328, 333 (9th Cir. 1988) (finding legitimate penological justification for conducting searches in public hallways where only alternative in the prison unit would have presented a risk to officer safety). Stoudemire did not have "a history of maladaptive behavior within prison" that might weigh in favor of conducting the search. *Id.* at 332 (collecting cases). Also, there were no time or resource constraints that supported the need for such an ad hoc search. Accordingly, although Dunagan had a valid reason for searching Stoudemire, no special circumstances provided additional justifications for strip searching Stoudemire where others could see her naked.

On balance, although the "test of reasonableness . . . is not capable of precise definition," *Bell*, 441 U.S. at 559, particularly as applied to prisoners, we conclude that, taking the facts as Stoudemire alleged them, she has established a constitutional violation. In so deciding, we do not underestimate the importance of deterring and detecting contraband in prisons, nor have we forgotten to afford Dunagan the deference due to a correctional officer executing a difficult discretionary responsibility. But it is settled that the law demands an adequate need for a strip search, and, depending on the

circumstances and context, restricts the scope, manner, and place of the search. *Id*. Here, the excessively invasive nature of the search outweighed any need to conduct it in such a fashion.

It is important to emphasize two points. First, it is unquestionable that the Supreme Court and lower courts have sanctioned a wide range of practices—many of them intrusive—that are designed to further legitimate penological interests. *See, e.g.*, *Florence*, 132 S. Ct. at 1518-20 (discussing significant interests for conducting strip searches as part of inmate booking process); *Hudson*, 468 U.S. at 529 (stating that "wholly random searches [of prison cells] are essential to the effective security of penal institutions"); *Bell*, 441 U.S. at 558 (holding that routine visual body cavity searches after contact visits do not violate the Fourth Amendment). Second, it is important to note that the MDOC's policies are not under review. Had Dunagan followed procedure, she would not have violated Stoudemire's Fourth Amendment rights. We are considering the acts of a single corrections officer sued in her individual capacity. Normally, separation of powers and federalism concerns weigh heavily in our review of prison regulations. *Turner*, 482 U.S. at 84-85. But we are not dealing with a policy or wide-ranging regulation, as indicated in the cases cited above. Instead, the "[f]actual nuances" of this case determine whether Dunagan violated Stoudemire's personal rights. *Florence*, 132 S. Ct. at 1523 (Roberts, C.J., concurring); *see also Bell*, 441 U.S. at 560. Our holding is confined to the facts, viewed most favorably to the inmate, of the particular search under review.

### 2. Whether Dunagan Violated a "Clearly Established" Right

As noted above, Dunagan's arguments on appeal focus primarily on the question of whether Stoudemire has satisfied the "clearly established" prong of the qualified immunity analysis in view of the fact that she does not cite any cases involving same-sex strip searches. While it is true that this court has stated that an expectation of privacy may, in the prison context, be particularly reasonable "where those claims are related to forced exposure to strangers of the opposite sex," *Cornwell*, 963 F.2d at 916, Dunagan is mistaken in suggesting that the gender of the parties involved is wholly dispositive of

the constitutional question. The gender of the parties is just one fact for the court to consider in determining the reasonableness of a given search or the legitimacy of a challenged practice. *See, e.g.*, *Michenfelder*, 860 F.2d at 333-34 (noting that "[s]hielding one's unclothed figure from the view of strangers, particularly strangers of the opposite sex is impelled by elementary self-respect and personal dignity," but ultimately concluding that the defendants had established a legitimate penological reason for involving female officers in strip searches of male inmates).

Dunagan's position is that inmates have no right to be free from *same-sex* strip searches. But that is not the right that Stoudemire is seeking to vindicate. Rather, Stoudemire has "identified a well established right, the right not to be subjected to a humiliating strip search in full view of several (or perhaps many) others *unless the procedure is reasonably related to a legitimate penological interest*." *Farmer v. Perrill*, 288 F.3d 1254, 1260 (10th Cir. 2002).[4] Thus, Dunagan's emphasis on the fact that this was not a cross-gender strip search is unavailing.

In evaluating whether a constitutional violation was clearly established, "[t]he key determination is whether a defendant moving for summary judgment on qualified immunity grounds was on notice that his alleged actions were unconstitutional." *Grawey*, 567 F.3d at 313. Based on the state of the law in existence at the time of the strip search, it was clearly established that suspicionless strip searches were permissible as a matter of constitutional law, but only so long as they were reasonable under the circumstances and performed pursuant to a legitimate penological justification. Thus, the district court did not err in holding that, viewing the evidence in the light most favorable to Stoudemire, a reasonable officer would have been on notice that the search was unreasonable under the circumstances and devoid of any legitimate penological justification related to security and order. *Stoudemire*, 2011 WL 1303418, at *9. We therefore affirm the denial of summary judgment for Dunagan on the ground of qualified immunity.

---

[4]We may look to the decisions of other circuits in determining whether a right is "clearly established" for qualified immunity purposes. *Dickerson*, 101 F.3d at 1158.

### D. Governmental Immunity Under State Law

Finally, both Davis and Dunagan assert that they are entitled to governmental immunity under state law on Stoudemire's claims against them under Mich. Comp. Laws § 330.1722(1), which provides that "[a] recipient of mental health services shall not be subjected to abuse or neglect." Stoudemire's claims against Davis and Dunagan under this statute are based on the same facts underlying her § 1983 claims against these Defendants. However, Michigan's governmental immunity law differs from federal qualified immunity doctrine. *See* Mich. Comp. Laws § 691.1407 (negligence); *Odom v. Wayne Cnty.*, 760 N.W.2d 217, 228 (Mich. 2008) (intentional torts). The district court did not discuss Stoudemire's state law claims and made no mention of Davis and Dunagan's state law defenses.

The considerations that "'classically support[] the law's ordinary remand requirement'" apply in this case. *Brown v. Crowley*, 312 F.3d 782, 788 (6th Cir. 2002) (quoting *INS v. Ventura*, 537 U.S. 12, 17 (2002)); *see also Norton v. Town of Islip*, 378 F. App'x 85, 89 (2d Cir. 2010) (remanding matter to district court where court failed to rule on defendants' immunity defenses to state-law-claims). Absent "exceptional circumstances," we normally decline to rule on an issue not decided below. *St. Marys Foundry, Inc. v. Emp'rs Ins. of Wausau*, 332 F.3d 989, 996 (6th Cir. 2003). No such circumstances are present in this case, and we therefore remand to "ensure that any future appeal in this case will have the benefit of the district court's analysis of the issues relating to" the Defendants' governmental immunity defenses. *Brown*, 312 F.3d at 788.

### IV.  CONCLUSION

For the foregoing reasons, we VACATE the district court's decision denying qualified immunity with respect to Stoudemire's § 1983 conditions of confinement claim against Davis and REMAND such claim to the district court for reconsideration in light of this opinion. We AFFIRM the district court's decision denying qualified immunity with respect to Stoudemire's § 1983 strip search claim against Dunagan, and REMAND

Defendants' motion regarding governmental immunity defenses under state law to the district court for consideration in the first instance.