NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0371n.06

No. 14-1742

**FILED**
May 22, 2015
DEBORAH S. HUNT, Clerk

**UNITED STATES COURTS OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| MARTINIQUE STOUDEMIRE, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHIGAN DEPARTMENT OF CORRECTIONS, et al., | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SUSAN DAVIS, Warden, Huron Valley Women's Facility, | ) ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

BEFORE:     BOGGS, SUHRHEINRICH, and WHITE, Circuit Judges.

SUHRHEINRICH, Circuit Judge.

## I.     INTRODUCTION

This is the second interlocutory appeal by Defendant Susan Davis ("Davis"), Warden of the Huron Valley Women's Facility, of the district court's denial of her request for qualified immunity from Eighth Amendment liability. Davis and other prison officials were sued by Plaintiff Martinique Stoudemire ("Stoudemire"), a former inmate at the Huron Valley Women's Facility and a double amputee, under 42 U.S.C. § 1983, 42 U.S.C. § 12132, and Mich. Comp. Laws § 330.1722, for violating, *inter alia*, Stoudemire's Eighth Amendment rights. As relevant

here, Stoudemire claims that, after her final amputation in December 2005, she was housed for approximately two weeks in a segregation cell that lacked accommodations for disabled persons, and that Davis was responsible for choosing the cell. Stoudemire alleges that Davis acted with deliberate indifference to her serious medical condition by placing her there.

On remand, the district court conducted that analysis and held that Davis was not entitled to qualified immunity. Davis appeals again.

## II.      BACKGROUND

This appeal turns on the following facts, summarized in our prior decision:

### A.  Stoudemire's Medical History

When twenty-three-year-old Martinique Stoudemire entered the MDOC [Michigan Department of Corrections] system in July 2002, she came with a long and well-documented history of health problems. Stoudemire suffered from systemic lupus erythematosus, a chronic and painful autoimmune disease; hypercoagulapathy, a related disorder characterized by a tendency to develop blood clots; and depression. Without proper care, Stoudemire bore a significant risk of experiencing kidney and liver damage, heart attacks, amputations, and chronic pain.

Stoudemire's health quickly deteriorated. During her five years at Huron, she experienced a heart attack, liver failure, and a number of life-threatening embolisms. She underwent three amputations, eventually losing both legs below the knee. By the time of her parole in August of 2007, she also suffered from chronic depression, post-traumatic stress disorder, and a number of conditions related to medications she had received during her incarceration. Stoudemire attributes her health complications to the alleged failure of MDOC staff members and associated doctors and nurses to provide her with adequate health care while she was incarcerated. For the purposes of this appeal, however, we focus on the events following Stoudemire's final amputation in December 2006, when her stump and buttock became infected with Methicillin-resistant Staphylococcus Aureusaie ("MRSA") and she was quarantined in Huron's segregation unit.

### B. Stoudemire's Placement in Huron's Segregation Unit

According to an April 14, 2005, Memorandum from Richard D. Russell, Administrator of the MDOC Health Care Bureau, "all prisoners with a documented culture positive for MRSA must be quarantined." The policy

2

provides that responsible staff members must notify the warden of the particular facility of a confirmed MRSA case in order to initiate the quarantine process. If health care staff determine that medical quarantine is necessary, the warden is responsible for isolating the infected inmates. The warden has the discretion to choose a quarantine location within the prison and may also opt to send infected inmates to another site. Davis designated Huron's segregation unit, which prisoners and guards call "the hole," as a quarantine location. The segregation unit is normally used for isolating prisoners who have violated prison rules.

Stoudemire spent roughly two weeks in quarantine as a consequence of her MRSA infection. At her deposition, Davis testified that she "was probably aware at the time" that Stoudemire had been placed in segregation for medical purposes but that she "[didn't] recall specifically."

Stoudemire alleges that she received extremely poor medical care while in segregation. The segregation cells were not equipped to accommodate disabled patients. Stoudemire was never provided with any assistive devices that might have allowed her to safely move between her bed, wheelchair, toilet, and shower. There was no call button, so Stoudemire had to shout when she needed assistance. She alleges that the medical staff treated her with contempt. They accused her of malingering and responded with hostility whenever she sought assistance. As a result, Stoudemire was left to care for herself. She was forced to crawl from her bed to the toilet. On one occasion, she had to urinate into a bowl. On another occasion, she defecated on herself. The staff neglected Stoudemire's hygiene. She received only one shower during her two weeks in segregation and was required to dress her wounds herself, which put her at risk of infection.

According to one of Plaintiff's experts, Stoudemire received "very little medical rounding" while she was in the segregation unit, which was "a terrible place to put an amputee." Davis testified that, in cases where a physically handicapped prisoner was placed in a segregation cell, she "would check the logbook to make sure that medical professionals had been through at least daily to see the prisoner for however often the prisoner's particular need was." Davis also testified that she would "check to make sure that my deputy warden or [an assistant deputy warden] had been through . . . [and] personally observed that prisoner to make sure that, you know, they weren't hanging themselves in the cell or what have you."

*Stoudemire v. Mich. Dep't of Corrs.*, 705 F.3d 560, 565-66 (6th Cir. 2013).

## C. Prior Interlocutory Appeal

In the first appeal, we vacated the district court's denial of qualified immunity because the district court had not conducted "a particularized analysis of whether Davis was deliberately

indifferent to the conditions of Stoudemire's confinement while in quarantine." *Id.* at 570. In particular, "[t]he district court did not mention any facts in the record that specifically pertained to Davis, nor did the district court make any findings regarding Davis's knowledge or mental state." *Id.* In other words, "there was no discussion of the subjective element of the claim: whether Davis, the warden, had 'a sufficiently culpable state of mind in denying [Stoudemire] medical care.'" *Id.* at 571 (quoting *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004)).

### D. On Remand

On remand, the district court found that the constitutional right at issue—to be free from cruel and unusual punishment while in confinement—was clearly established, citing *Estelle v. Gamble*, 429 U.S. 97 (1976) (holding that "deliberate indifference" to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," (internal quotation marks and citation omitted)). The district court also held that Stoudemire met her burden of demonstrating both the objective and subjective components of her Eighth Amendment claim.

The district court found that the objective component was established because Stoudemire had a serious medical need as a double amputee with no motor function below her knees who acquired MRSA after the amputation of her left leg. Furthermore, the conditions of her confinement posed a substantial risk of serious harm, because "not only was her cell ill-equipped to house a double amputee, there was no mechanism for an inmate such as [Stoudemire] to alert the penal staff of those pertinent issues related to her MRSA infection." The court found this fact "particularly alarming," since Stoudemire had just been released from the University of Michigan Hospital after her third amputation "just hours before being placed in

segregation"; the move from the infirmary to the segregation was motivated by the MRSA infection; and an MDOC internal memorandum clearly stated that its facilities must take "'a proactive, more aggressive approach to MRSA infection[s].'"

The district court found that the following factors established the existence of a genuine issue of material fact as to the subjective component of deliberate indifference: (1) "First and foremost, Davis acknowledged that Huron Valley's segregation unit lacked handicap accessible cells during all times relevant to this case"; (2) Davis recalled in her deposition that she knew Stoudemire was a double amputee; (3) Davis testified that she "probably was aware at the time" that Stoudemire was assigned to the segregation unit because of her MRSA infection; (4) an MDOC internal memorandum required Huron Valley's Bureau of Health Care Services to notify the warden of each confirmed MRSA case "to initiate the quarantine"; and (5) Davis testified that she made daily rounds to ensure that the medical needs of quarantined prisoners with physical handicaps were adequately addressed. The district court therefore found that "the record herein suggests that Davis had reason to know that the Plaintiff—a double amputee recovering from MRSA—was housed in a cell without a trapeze, grab bars, or a commode chair, and had a very limited means of alerting prison officials if additional medical attention was necessary." The court held that, viewing the facts in a light most favorable to Stoudemire, "a reasonable jury could find that Davis was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and she ignored that risk."

On appeal, Davis asserts that she was not deliberately indifferent to Stoudemire's medical needs because she relied on medical staff and was never informed that Stoudemire's needs were not being met. Thus, she maintains that the district court erred in not granting her qualified immunity.

### III.     JURISDICTION

Pursuant to the "collateral order" doctrine, we have interlocutory jurisdiction under 28 U.S.C. § 1291 to review the district court's denial of qualified immunity to the extent it turns on an issue of law.  *Mitchell v. Forsyth*, 472 U.S. 511, 529-30 (1985); *Stoudemire*, 705 F.3d at 564. A defendant "may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995); *Romo v. Largen*, 723 F.3d 670, 674 (6th Cir. 2013).  *See also Roberson v. Torres*, 770 F.3d 398, 402 (6th Cir. 2014) (stating that "*Johnson* offered the following general guidance: 'interlocutory appeals of qualified immunity matters' should be limited 'to cases presenting more abstract issues of law.'"(citation omitted).  On the other hand, appeals "contesting whether the undisputed facts support . . . deliberate indifference do not run afoul of *Johnson*."  *Family Serv. Ass'n ex rel. Coil v. Wells Twp*., -- F.3d -- , No. 14-4020, 2015 WL 1726571, at *5 (6th Cir. Apr. 16, 2015) (citing *Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999) (en banc)).

Stoudemire contends that Davis has not presented an appealable issue because she merely challenges the sufficiency of the evidence.  Davis counters that she "does not challenge the sufficiency of the evidence" but asks only "'whether the law clearly proscribed the actions'" she took.  Reply Br. at 7 (quoting *Johnson*, 515 U.S. at 312).  She maintains that she "accepts Stoudemire's facts as true and supplements them with other known facts."  *Id.*  Given this concession, we have jurisdiction to rule on the merits that the record in this case presents a reasonable inference that Davis was subjectively aware of, and thus deliberately indifferent to, Stoudemire's serious medical condition.  *See Coil*, 2015 WL 1726571, at *5.  *See also Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005) (holding that even if the defendant

disputes the facts, this court has jurisdiction if the defendant also raises the purely legal issue of whether the facts alleged would support a violation of clearly established law).

## IV. STANDARD OF REVIEW

We review de novo the district court's denial of a defendant's motion for summary judgment on qualified-immunity grounds. *Stoudemire*, 705 F.3d at 565. Summary judgment is proper if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Stoudemire*, 705 F.3d at 565. Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Stoudemire*, 705 F.3d at 565. We view all facts and draw all reasonable inferences in favor of the nonmoving party. *Id.*

## V. ANALYSIS

A government official is shielded from § 1983 liability if his actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The burden rests on the plaintiff to show that the defendant is not entitled to qualified immunity. *Reilly v. Vadlamudi*, 680 F.3d 617, 623 (6th Cir. 2012). Thus a plaintiff must show that the defendant violated a constitutional right and that the right was clearly established. *Pearson*, 555 U.S. at 232.

Stoudemire claims that Davis deprived her of her Eighth Amendment right to be free of cruel and unusual punishment by assigning her to an improper segregation cell. An Eighth Amendment claim has two components, one objective, one subjective. First, the alleged deprivation must be, objectively, "sufficiently serious," *i.e.,* the "official's act or omission must result in the denial of the minimal civilized measure of life's necessities," *Farmer v. Brennan*,

511 U.S. 825, 834 (1970) (citations and internal quotation marks omitted). Second, the official must have been "deliberately indifferent" to the inmate's health or safety. *Id.*

On appeal, Davis does not challenge the district court's ruling on the objective component of Stoudemire's Eighth Amendment claim or the district court's holding that the constitutional right was clearly established. Indeed, the law regarding prison conditions is clear. The Constitution does not mandate comfortable prisons, but it does not tolerate inhumane ones. *Farmer*, 511 U.S. at 832. At core, "[t]he Amendment embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." *Estelle*, 429 U.S. at 102 (internal quotation marks and citation omitted). Thus, it protects against punishments incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.* (internal quotation marks and citation omitted).

"As a society, we have grown increasingly sensitive to the need to accommodate individuals with disabilities." *Frost v. Agnos*, 152 F.3d 1124, 1129 (9th Cir. 1998). Numerous courts have held that the failure to provide handicap-accessible bathroom facilities may violate the Eighth Amendment. *See, e.g.*, *Kiman v. N.H. Dep't of Corrs.*, 451 F.3d 274, 287-88 (1st Cir. 2006) (holding that the plaintiff inmate, who suffered from ALS, presented evidence that corrections officers prevented him from using a shower chair or accessible shower facilities despite repeated requests); *Frost*, 152 F.3d at 1129 (finding triable issue of fact regarding the failure to provide adequate shower facilities to an inmate who wore a leg cast and used crutches); *LaFaut v. Smith*, 834 F.2d 389, 394 (4th Cir. 1987) (Powell, J., sitting by designation) (holding that paraplegic prisoner who alleged that prison officials had denied him adequate toilet facilities and necessary physical therapy despite the inmate's repeated requests stated an Eighth Amendment claim); *Muhammed v. Dep't of Corrs.*, 645 F. Supp. 2d 299, 314-18 (D. N.J. 2008) (holding that

amputee prisoner stated an Eighth Amendment claim where he alleged he was assigned to an upper bunk in a cell located from a handicap accessible shower), *aff'd,* 396 F. App'x 789 (3d Cir. 2010); *Schmidt v. Odell*, 64 F. Supp. 2d 1014, 1029-33 (D. Kan. 1999) (holding that double amputee forced to crawl around the floor of the jail stated an Eighth Amendment claim).

Davis challenges the subjective component. "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. This means that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* *See also Barker v. Goodrich*, 649 F.3d 428, 434 (6th Cir. 2011); *Spencer v. Bouchard*, 449 F.3d 721 (6th Cir. 2006*), abrogated on other grounds by Jones v. Bock*, 549 U.S. 199 (2007). An official's failure to address a significant risk that the official should have perceived, but did not, "while no cause for commendation," does not constitute infliction of punishment and therefore does not violate the Eighth Amendment. *Farmer*, 511 U.S. at 838.

In proving subjective intent,

> [t]he question of whether an official actually perceived, inferred, or disregarded a risk is a question of fact for the jury "subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842, 114 S. Ct. 1970; *Clark–Murphy v. Foreback*, 439 F.3d 280, 290 (6th Cir. 2006). Yet a court must also consider other factors—such as the obviousness of the risk, the information available to the official, the observable symptoms, and the expected level of knowledge of the particular official. *Farmer*, 511 U.S. at 842–43, 114 S. Ct. 1970; *LeMarbe*, 266 F.3d at 436–39. If a risk is obvious or if it is well-documented and circumstances suggest that the official has been exposed to information such that she must have known of the risk, the evidence is sufficient for a jury to find that the official had knowledge. *Farmer*, 511 U.S. at 842–43, 114 S. Ct. 1970.

*Sours v. Big Sandy Reg'l Jail Auth.*, 593 F. App'x 478, 484 (6th Cir. 2014).

> Davis does not dispute that she knew:
>
> --All inmates diagnosed with MRSA were required to be quarantined, and that once Health Care Services made that determination and notified her of that decision, it was her responsibility to place the inmate.
>
> --Stoudemire was a double amputee, suffering from a MRSA infection after a recent surgery, and Davis remembered her from doing rounds.
>
> --The segregation cells were not equipped for disabled individuals, other than a handicap-accessible bathroom and shower in the segregation unit, and lacked a mechanism for contacting penal staff for assistance.

Given the obviousness of the risk from these facts alone, it can be inferred that Davis had actual knowledge of the substantial risk to Stoudemire. *See Clark-Murphy v. Foreback,* 439 F.3d 280, 290 (6th Cir. 2006) (holding that, for summary judgment purposes, eleven defendants who had repeated interactions with the inmate and repeated opportunities to assess the seriousness of the situation could have perceived a substantial risk of serious harm to inmate; "[w]hether in fact they perceived, inferred or disregarded the risk is an issue for trial").

Davis argues that she relied on medical staff, whom she knew were making regular rounds, and was unaware that Stoudemire had stopped asking the staff for help, or that she suffered such indignities as defecating on the floor. She points out that, per MDOC policy, Health Care Services is responsible for determining the health care needs of prisoners. This included the decision to quarantine as well as the need for special housing accommodations.[1] Given the scope of her duties and lack of medical training, Davis claims she acted reasonably in relying on the medical staff's recommendations.

---

[1] Dr. Pramstaller, the MDOC's Chief Medical Officer at the time in question, testified as follows:

Q: . . . [W]hose responsibility was it to evaluate the appropriateness of the housing for Ms. Stoudemire if she was disabled and where they were putting her was not handicap accessible?

A: Well, Health Care's responsibility would be to outline what she needed. And if she needed a handicap accessible room, I'm sure she had a medical detail or special accommodation for that. And if they then indicated that she needed medical quarantine, then that would be added on the housing responsibilities. Now, I'm not sure what they had at the facility. I mean, sometimes you get into the situation where you could not find a placement that met all of the criteria and you would have to decide which criteria. And in some cases, the warden would do that; in other cases, Health Care would get involved in that.

This argument begs the question of what Davis needed to be told in order to comprehend the substantial risk to Stoudemire. In today's society, handicap facilities, particularly bathroom accommodations, are considered "the minimal civilized measure of life's necessities." *See Farmer*, 511 U.S. at 834. This court has observed that "a genuine issue of material fact as to deliberate indifference can be based on a strong showing on the objective component." *Carter*, 408 F.3d at 313. As the district court held, a reasonable jury could conclude that Davis was deliberately indifferent to Stoudemire's needs since she admittedly knew of Stoudemire's condition, and nonetheless placed her in a cell that was not suitable for a handicapped person and further lacked a means of seeking help from the penal staff.

Davis's attempt to hide behind the Health Care staff is unavailing because she was responsible for the placement decision and she was personally aware of Stoudemire's condition. Thus, the issue here is not *respondeat superior*, because Davis knew of Stoudemire's condition, the prison's conditions, and was personally involved in the ultimate placement decision. *See Clark-Murphy*, 439 F.3d at 288-90 (holding that prison guards and psychologist were not entitled to qualified immunity because they were in a position to perceive the inmate's strange behavior, knew that he had not received the psychological assistance he needed, and should have perceived a serious risk to inmate based on a heat wave and the fact that the water to his cell was cut off); *Scicluna v. Wells*, 345 F.3d 441, 445 (6th Cir. 2003) (holding that a corrections officer was not entitled to qualified immunity for failing to segregate the plaintiff from another inmate although he knew of the hostile relationship between the prisoners and the risk was obvious); *Comstock v. McCrary*, 273 F.3d 693, 704-11 (6th Cir. 2001) (evidence was sufficient to establish that prison psychologist was subjectively aware of and deliberately indifferent to risk that the prisoner might commit suicide where the psychologist released prisoner from suicide watch without evaluating

11

prisoner's suicide risk at the time of release; subjective intent could be inferred from the fact that the psychologist put the prisoner on suicide watch the day before he committed suicide and the fact that the psychologist suspected that other inmates had targeted the inmate as a snitch); *LeMarbe v. Wisneski*, 266 F.3d 429, 437-38 (6th Cir. 2001) (holding that the plaintiff established sufficient facts for a rational factfinder to conclude that the defendant doctor was aware of an obvious risk to an inmate's health after surgery and disregarded it).

Because the record in this case would allow a jury to infer deliberate indifference to Stoudemire's serious medical needs, we hold that the district court properly denied Davis's request for qualified immunity. *Cf. Carter,* 408 F.3d at 310 (holding that the defendant's actions were sufficient to permit a jury's inference that the defendant was deliberately indifferent to the pretrial detainee's serious medical needs where the defendant knew that the detainee was complaining of classic symptoms of a heart attack and failed to transport her to the hospital). [2]

## VI.    CONCLUSION

For the foregoing reasons, we AFFIRM.

---

[2]In her principal brief, Davis discusses authority regarding the sufficiency of the complaint under Fed. R. Civ. P. 12(b)(6). Davis does not develop any argument on this point, however. In any event, the district court considered matters outside the pleading in deciding Davis's motion and Davis herself cites to the record. Thus, the matter was properly treated as a motion for summary judgment under Rule 56. *See* Fed. R. Civ. P. 12(d).