Berry MEADOWS; Deanna Meadows;
Digging Dirt, LLC., Plaintiffs–
Appellees,

v.

James ENYEART; Frank Migliozzi,
Defendants–Appellants.

No. 14–4001.

United States Court of Appeals,
Sixth Circuit.

Oct. 1, 2015.

Before: BOGGS and MOORE, Circuit
Judges; and REEVES, District Judge.*

* The Honorable Danny C. Reeves, United States District Judge for the Eastern District of Kentucky, sitting by designation.

BOGGS, Circuit Judge.

This case involves a dispute between septic-system regulators and septic-system installers in Trumbull County, Ohio. Defendants–Appellants Dr. James Enyeart and Frank Migliozzi are regulators who appeal the denial of their claim of qualified immunity against a First Amendment retaliation claim filed under 42 U.S.C. § 1983 by Plaintiffs–Appellees Berry and Deanna Meadows. The district court denied qualified immunity because it found genuine issues of material fact as to whether the Defendants–Appellants unlawfully retaliated against the Meadowses' exercise of First Amendment rights by (1) sending a cease-and-desist letter to the Meadowses from a privately hired attorney and (2) subjecting Berry Meadows to an administrative hearing that delayed the renewal of his septic-system-installation permit.

We hold that sending the cease-and-desist letter was not an action under color of state law and thus cannot be the basis for a § 1983 claim. Additionally, the Defendants demonstrated that they had probable cause to believe that Berry Meadows violated septic regulations and thus would have brought an administrative proceeding against him, whether or not they also had retaliatory animus. We therefore reverse the district court's denial of qualified immunity.

## I. Factual and Procedural Background

### A

The Meadowses own and operate Digging Dirt, LLC, a septic-system-installation company. Dr. Enyeart is the Commissioner of the Trumbull County Health Department (Health Department) and Migliozzi is the Health Department's Environmental Director.

In August 2006, the Health Department entered into a consent decree with the Ohio Environmental Protection Agency (OEPA) that required the Health Department to "eliminate septic system off-lot discharge; filter off-lot discharge with sand filters; [and] implement point of sale inspections such that real property cannot be bought/sold in Trumbull County without registered sanitarian approval." The consent decree was amended on June 6, 2008, to "allow for the filtration of off-lot discharge with certain tertiary filters, other than the sand filter required by the Consent Decree." But such tertiary filters must "meet or exceed the performance of a sand filter."

The Meadowses developed a tertiary filter as an alternative to sand filters. In 2008, the Meadowses sought approval from the Defendants to install an initial version, designated A600, but the Health Department denied approval after the OEPA determined that the proposed device "does not meet the criteria set forth in the Consent Decree." In January 2011, the Meadowses sought approval from the Health Department to install an updated version, designated AS600–1. The OEPA assessed the new device and found "a number of deficiencies and/or areas of concern." The OEPA told Enyeart on March 29, 2011, that, "[d]ue to the considerable lack of testing and performance data, this office is not confident that the AS600–1 filter unit could be considered the tertiary equivalent of a slow surface sand filter." The Defendants thereafter denied Berry Meadows's request for approval to install the AS600–1 unit.

Thereafter, the Meadowses began to criticize the Defendants publically. Many critical statements alleged that the Defendants rejected the Meadowses' proposed filtration system in order to favor the producers of competing systems. At a March

2012 meeting of the Trumbull County Board of Health (Board of Health), Deanna Meadows accused the Defendants of specific acts of corruption for the purpose of "eliminating the fair competition in the septic industry." She posted a video recording of her accusations the next day on her Facebook page, which was titled "Trumbull County Septic News." Over the next 18 months, Deanna Meadows made additional critical comments about the Defendants and other Health Department officials on her Facebook page, including allegations of corruption and incompetence. Berry Meadows accused Migliozzi of granting "favors for friends" in a written January 2012 complaint to the Health Department and at a February 2012 board meeting. He also posted on the Septic News Facebook page in October 2012, accusing Enyeart and Migliozzi of blocking his invention of a cost-effective filtration system because they wanted to promote a system that was sold by another supplier.

The Defendants responded by retaining a private attorney. The attorney sent a letter to the Meadowses on April 12, 2012, demanding that the Meadowses (1) cease making defamatory remarks against the Defendants and (2) remove defaming statements from their Facebook page.

During this period, the Health Department received numerous customer complaints about Berry Meadows and Digging Dirt. According to Enyeart, complaints against Berry Meadows comprised over two-thirds of all customer complaints to the Health Department about septic-system installations in 2011–12. A February 2012 report of an Ohio Department of Health investigation into septic-system malfunctions concluded that seven out of eleven systems installed by Digging Dirt in 2011 had failed.[1] Two complaints to the Health Department alleged that Berry Meadows took payment for installations but failed to perform any work. The Defendants forwarded these complaints to local law-enforcement officials, and Berry Meadows was charged and arrested in each case. However, the prosecutor dismissed charges in both instances.[2]

On August 10, 2012, the Health Department initiated an administrative hearing against Berry Meadows for multiple violations of the Ohio Administrative Code. In such hearings, the Health Department brings changes and an independent hearing officer determines whether the installer committed any violations.

1. The OEPA conducted an investigation in response to numerous reports of septic-tank-installation problems, and examined 60 septic systems that were installed between September 1, 2010, and April 30, 2011, by nine different installation companies. A total of 14 systems failed, of which 7 were installed by Digging Dirt and Berry Meadows. No other installation company had more than two failed installations during the same period.

2. On June 23, 2009, Berry Meadows contracted with Harold Scott to install a septic system, and Scott gave Berry Meadows $6,500 in partial payment. On August 9, 2011, Scott complained to the Health Department that Digging Dirt had performed no work on this project. Dr. Enyeart forwarded the complaint to the Trumbull County prosecutor, and Migliozzi relayed the information to the Trumbull County Sheriff's Office. Scott filed a criminal complaint against Berry Meadows on May 14, 2012. Berry was arrested the following day, but the prosecutor dismissed the charges following a preliminary hearing. In 2007, Berry Meadows agreed to install a septic system for William Ball and Angel Bennet. The complaint alleged that Berry failed to perform any work after he had received $7,000 in partial payment. Bennett field a criminal complaint against Berry, and a warrant was issued on April 5, 2012. Berry turned himself in on the next day, and the prosecutor dismissed charges the day after that.

The Defendants claim that the hearing was in response to the numerous complaints against Berry Meadows's septic installations, while the Meadowses claim that the proceeding was retaliation for the critical remarks about the Defendants. While such hearings typically last one day, the hearing against Berry Meadows went on for four days and still did not reach a conclusion. Enyeart prematurely ended the hearing without dropping the charges against Berry Meadows on November 16, 2012. According to Enyeart, he ended the hearing because he recognized that Berry Meadows's defense strategy would prolong the proceeding by several weeks and the Health Department lacked the resources to continue the prosecution. The hearing officer ruled in favor of Berry Meadows on February 22, 2013. Even though he eventually prevailed at the hearing, Berry Meadows claims that the Board of Health did not renew his installation permit when it expired in December 2012 due to the on-going proceedings. As a result, he was unable to conduct his business until the Board renewed his permit in April 2013.

## B

The Meadowses filed suit under 42 U.S.C. § 1983 on September 9, 2012—after the Defendants brought the hearing but before the expiration of Berry Meadows's installation permit—in the United States District Court for the Northern District of Ohio. The amended complaint named Enyeart, Migliozzi, and several law-enforcement officers as defendants and alleged malicious-prosecution, equal-protection, and First Amendment retaliation claims. Enyeart and Migliozzi filed a defamation counterclaim under Ohio state law on the basis of the Meadowses' public remarks and Facebook posts. The Meadowses voluntarily dismissed their claims against the law-enforcement defendants on December 12, 2013.

The Meadowses moved for summary judgment on the defamation counterclaim. The district court denied the motion, finding that the Defendants were public officials and that there were genuine issues of material fact as to whether the Meadowses were motivated by actual malice. The Defendants moved for summary judgment on the basis of qualified immunity. The district court granted the Defendants' summary-judgment motion with respect to the Meadowses' malicious-prosecution and equal-protection claims, but denied summary judgment on the Meadowses' First Amendment retaliation claim. The district court found that genuine issues of material fact remained as to whether two of the Defendants' actions qualified as unlawful retaliation: (1) sending the cease-and-desist letter to the Meadowses and (2) initiating the hearing that ultimately delayed the renewal of Berry Meadows's installation permit.

The Defendants filed an interlocutory appeal. The Meadowses cross-appealed the grant of summary judgment for the Defendants on the malicious-prosecution and equal-protection claims and the denial of their motion for summary judgment on the defamation counterclaim. We dismissed the cross-appeal because the issues encompassed therein were not inextricably intertwined with any legal issue that we may review in the Defendants' interlocutory appeal. *Digging Dirt, LLC v. Enyeart*, 14–4001/4042 (6th Cir. Dec. 16, 2014) (unpublished).

## II. Analysis

### A

We review de novo a district court's denial of a defendant's motion for summary judgment on qualified-immunity

grounds. *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 565 (6th Cir.2013). Summary judgment is proper if there is no genuine issue as to any material facts, and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a).

"Under the doctrine of qualified immunity, government officials performing discretionary functions ... generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Meals v. City of Memphis*, 493 F.3d 720, 729 (6th Cir.2007) (internal quotation marks omitted). Qualified immunity is an affirmative defense that protects government officials from liability "when a reasonable official in the defendant's position would not have understood his or her actions to violate a person's constitutional rights." *Ibid.*

After a defendant raises a qualified-immunity defense, the burden shifts to the plaintiff to demonstrate that the government official violated a right that was so clearly established "that every 'reasonable official would have understood that what he [was] doing violate[d] that right.'" *Ashcroft v. al–Kidd*, 563 U.S. 731, 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). In analyzing an assertion of qualified immunity, courts ask (1) whether, viewing the evidence in the light most favorable to the injured party, a constitutional right has been violated; and (2) whether that right was clearly established. *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Courts may analyze these two questions in any order. *Ibid.*

The denial of qualified immunity on legal grounds is appealable under the collateral-order doctrine. *Mitchell v. Forsyth*, 472 U.S. 511, 529–30, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Stoudemire*, 705 F.3d at 564. But factual disputes that "a party may, or may not, be able to prove at trial," are generally unreviewable on interlocutory appeal, *Johnson v. Jones*, 515 U.S. 304, 313, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995), because a purely fact-based challenge "does not present a legal question in the sense in which the term was used in *Mitchell.*" *Plumhoff v. Rickard*, —— U.S. ——, 134 S.Ct. 2012, 2019, 188 L.Ed.2d 1056 (2014). However, we may "decide an appeal challenging a *legal* aspect of the district court's factual determinations." *DiLuzio v. Vill. of Yorkville, Ohio*, 796 F.3d 604, 608–09 (6th Cir.2015). This includes whether the district court properly assessed undisputed facts in the record, *Plumhoff*, 134 S.Ct. at 2019, and whether the district court's factual determination is "blatantly contradicted by the record, so that no reasonable jury could believe it," *Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); *see also Moldowan v. City of Warren*, 578 F.3d 351, 370 (6th Cir.2009); *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 496 (6th Cir.2012).

**B**

In order to recover under § 1983, a plaintiff must prove: (1) that he was deprived of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was caused by a person acting under color of state law. *Marcilis v. Twp. of Redford*, 693 F.3d 589, 595 (6th Cir.2012). "[A]cting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (U.S.1988) (internal

quotation marks omitted). The district court identified two ways in which the Defendants retaliated against the Meadows's First Amendment conduct.

First, the Defendants directed their privately hired attorney to send a letter threatening the Meadowses with legal action. When analyzing the private action of a public official, "[i]t is the nature of the act performed ... which determines whether the [official] has acted under color of law." *Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir.1975). In *Stengel*, we considered whether an off-duty and out-of-uniform police acted under color of state law when he intervened in a barroom altercation, shooting and killing two brawlers and wounding a third. We concluded that the officer acted under color of state law because: (1) the officer fired his service weapon that department regulations required him to carry at all times; and (2) he intervened pursuant to a department-imposed duty to take action "in any type of police or criminal activity 24 hours a day." *Ibid.* In contrast, *Redding v. St. Eward* involved an off-duty police officer who made 911 calls at 1:00 am and 2:00 am to report that a woman was banging on the doors and windows of the home in which the officer and her daughter were staying. 241 F.3d 530, 532 (2001). The police arrested the woman for attempted home invasion, and she brought a false-arrest claim against the off-duty officer under § 1983. *Ibid.* We held that the off-duty officer in *St. Eward* was not acting under color of state law because her 911 calls were "functionally equivalent to that of any private citizen calling for police assistance." *Id.* at 533.

■ The Defendants in this case are public officials who hired a private attorney to send a cease-and-desist letter. Enyeart and Migliozzi did not act out of a state-imposed duty. Rather, they were motivated to safeguard their personal reputations. Nor did the Defendants threaten to initiate anything other than private legal action against the Meadowses. Because any person may hire a private attorney to threaten private legal action, it cannot be said that the letter was "possible only, because [the Defendants were] clothed with the authority of state law." *West*, 487 U.S. at 49, 108 S.Ct. 2250. Rather, the "nature of the act performed" was "functionally equivalent to that of any private citizen." *St. Eward*, 241 F.3d at 532. Therefore, the Defendants did not act under color of state law in sending the cease-and-desist letter, and the Meadowses cannot recover in a § 1983 action on the basis of that letter.

Second, the district court held that the Defendants were responsible for delaying the renewal of Berry Meadows's septic-system-installation permit because they initiated the administrative hearing.[3] The hearing was unquestionably an exercise of "power possessed by virtue of state law," West, 487 U.S. at 49, 108 S.Ct. 2250, and therefore the Defendants acted under color of state law.

We next turn to the issue of whether the administrative hearing deprived the Meadowses of a clearly established right se-

3. The Board of Health, and not the Defendants, is responsible for actually issuing or denying installation permits. Trumbull Cnty. Gen. Health Dist. Sewage Treatment Sys. Reg. 3701–29–04(A). Berry Meadows's permit expired in December 2012, and the Board approved his application for a new permit at its April 2013 monthly meeting, after the hearing was resolved in February 2013. The Board did not approve Berry Meadows's application at its March 2013 monthly meeting because a newly elected board member wanted an opportunity to review the situation.

cured by the Constitution or federal law. *Marcilis,* 693 F.3d at 595.

## C

We have "clearly stated that private citizens have a First Amendment right to criticize public officials and to be free from retaliation for doing so." *Holzemer v. City of Memphis,* 621 F.3d 512, 520 (6th Cir. 2010). The Defendants brought the hearing on August 10, 2012, which means that the hearing could be retaliation only against statements that were made prior to that date. These include:

- A January 2012 complaint by Berry Meadows to the Board of Health—the content of which was posted on Facebook by his wife in March 2012—alleging that Migliozzi corruptly granted "favors for friends" to suppress septic-system competition. Berry repeated these allegations at the February 2012 Board of Health meeting.
- March 2012 statements by Deanna Meadows at a Board of Health meeting, which she later uploaded to Facebook in video form, accusing the Defendants of corruptly suppressing septic-system competition.
- July 2012 posts on Facebook accusing the Defendants of incompetence and accusing the Board of Health of tolerating Defendants' incompetence and unethical conduct.

The other speech activities identified by the Meadowses took place after August 10, 2012 and so cannot be the basis of a First Amendment retaliation claim arising from the hearing.

In order to establish a prima facie case of First Amendment retaliation, a plaintiff must prove that:

(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct. *Thaddeus–X v. Blatter,* 175 F.3d 378, 394 (6th Cir.1999) (en banc). Upon a prima facie showing, the burden shifts to the defendant to rebut the causal connection between the protected conduct and the adverse action by demonstrating that he would have undertaken the same adverse action absent the plaintiff's protected conduct. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), *abrogated on other grounds by Burlington N. & Santa Fe. Ry. Co. v. White,* 548 U.S. 53, 67, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); *see also Thaddeus–X,* 175 F.3d at 399.

### a. Did The Meadowses Engage in Protected Speech Activities?

We first consider whether the Meadowses' critical remarks concerning the Defendants were protected. The Defendants argue that the First Amendment does not protect the Meadowses' false and defamatory statements. Appellants' Br. at 29. This argument fails at this stage because the Defendants are public officials, and even false statements concerning public officials are protected by the First Amendment unless they were made with actual malice. *New York Times v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The district court determined that disputed issues of material fact remain as to whether the Meadowses acted with actual malice, and we lack jurisdiction to review this determination on interlocutory appeal, *Johnson,* 515 U.S. at 319–20, 115 S.Ct. 2151.

The Defendants respond that the actual-malice requirement only restricts "a public official from *recovering damages* for a de-

*famatory* falsehood related to his official conduct," and that it does not alter the definition of defamation. Appellants' Br. at 31 (quoting *New York Times*, 376 U.S. at 279–80, 84 S.Ct. 710) (first emphasis added). But the issue here is not whether a statement was defamatory but rather whether a statement was entitled to First Amendment protection. Public officials cannot recover in a defamation action absent a showing of actual malice precisely because non-malicious statements, even if false and otherwise defaming, are protected by the First Amendment. *New York Times*, 376 U.S. at 279–80, 84 S.Ct. 710. The Meadowses' statements concerning the Defendants cannot be shown at this stage to have been made with actual malice and so are not excluded form First Amendment protection. The Meadowses therefore meet the first element of their retaliation claim.

**b. Did The Meadowses Suffer an Adverse Action?**

Next we consider whether the Meadowses suffered an "adverse action." "[A]n adverse action is one that would 'deter a person of ordinary firmness' from the exercise of the right at stake." *Thaddeus–X*, 175 F.3d at 396. We have found that delaying the grant of a business permit is an adverse action. *Holzemer*, 621 F.3d at 525. Moreover, in the employment-law context, an investigatory suspension without pay constitutes an adverse action. *White*, 548 U.S. at 72, 126 S.Ct. 2405 (2006). The hearing against Berry Meadows in this case delayed his access to a business permit. This prevented him from working for several months and so had an

effect that was similar to an investigatory suspension without pay. Accordingly, the hearing was an adverse action that caused an "injury that would likely chill a person of ordinary firmness from continuing to engage in" the protected First Amendment activity. *Thaddeus–X*, 175 F.3d at 397.

**c. Can the Meadowses Establish a Causal Connection Between Their Speech Activities and the Adverse Action?**

The final prima facie element requires a plaintiff to "produce enough evidence of a retaliatory motive such that a reasonable juror could conclude that [the adverse action] would not have occurred but for his engagement in protected activity." *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 209 (6th Cir.2010). The district court held that "there is sufficient evidence for a reasonable jury to find that Defendants' [sic] refused to renew Berry Meadows's installer permit and subjected him to an administrative hearing in retaliation for [the Meadowses'] speech."

The district court relied, in part, on "evidence that Berry [Meadows] was the *only* installer who was subjected to an administrative hearing regarding his installer permit during Defendants' tenure as [Health Department] officials." But public records show that, during their tenure at the Health Department, the Defendants initiated at least a dozen administrative hearings against other individuals for violation of the Ohio Administrative Code.[4] At least four of these individuals had their installation permits revoked or suspended.[5]

---

4. These include hearings against: Anthony Gumino in 2003; David Eaken in 2003; Anthony Gumino in 2005; Matt Kotanchek in 2005; Edward Garland in 2006; Timothy Garland in 2006; Paul Pasquerilla in 2006; James Scharba in 2007; Chuck Neff in 2008;

Edward Frye in 2008; Ammon Weaver in 2008; Edward Frye in 2009; and John Moon in 2010.

5. Dr. Enyeart contends that the Health Department has revoked or suspended seven in-

The sole evidence in the records suggesting that Berry Meadows was the only installer subject to an administrative hearing was Berry Meadows's own assertion that "I *know* of no other septic installer who was subjected to an administrative hearing by Dr. Enyeart and Migliozzi in order to have his or her system installer permit renewed." But Berry Meadows's stated lack of knowledge of any hearings against other septic installers carries even less force than a conclusory allegation, which is insufficient—as a matter of law—to defeat a motion for summary judgment without probative evidence in support. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Tellingly, on appeal, the Meadowses do not repeat the assertion that the Defendants have never brought hearings against any other installers. Instead, they argue in the alternative that, "even if other installers were brought before administrative tribunals, there are facts in the record that, when viewed in the light most favorable to the Meadows[es], support the inference that Enyeart and Migliozzi delayed the permit renewal, and commenced the administrative hearing in order to punish the Meadows[es]." Appellees' Br. at 47. We agree.

Animus towards the plaintiff's statements or viewpoints can support the inference of retaliatory motive, *see Crawford–El v. Britton*, 523 U.S. 574, 592, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998), and the record contains ample evidence of Defen-

dants' animus towards the Meadowses' speech. While the cease-and-desist letter was not actionable under § 1983, it nonetheless evinces the Defendants' objection to the Meadowses' statements. Additionally, Migliozzi told Berry at a public meeting that "I am tired of you always stirring up shit," and Enyeart stated at the same meeting that "Berry Meadows is not finished, and neither am I." The Meadowses also alleged that the Defendants pursued a bond claim against Berry Meadows on behalf of a complaining customer when they did not pursue a bond claim against a similarly situated installer. And the Defendants do not directly refute this assertion.[6] We agree with the Meadowses that, when viewed in a light favorable to them, the evidence permits a reasonable fact finder to infer a causal connection between their public criticism of the Defendants and the administrative hearing. Accordingly, the Meadowses establish a prima facie case of First Amendment retaliation. That does not end our inquiry, however.

### d. Would the Defendants Have Brought the Hearing Absent the Meadowses' Speech Activities?

Once the plaintiff establishes a prima facie case of First Amendment retaliation, a defendant can avoid liability by showing that he would have taken the adverse action against the plaintiff even absent the protected speech and retaliatory motive. *Hartman v. Moore*, 547 U.S. 250, 260, 126

staller permits during his tenure as director. He only furnished documentation as to four revocations, including three letters notifying individuals of the revocation and one letter regarding an individual's request for reinstatement of an installer's permit after it had been revoked.

**6.** The Department of Health brings bond claims against installers on behalf of customers. Berry Meadows asserts that the Defen-

dants failed to pursue a bond claim against an installer named Jeff Jardine after a customer named Mary McCochy complained about him. Enyeart could not recall whether he brought a bond claim against Jardine on the basis of that complaint. The Defendants produced documents indicating that they brought bond claims against several installers, but none of these were brought against Jardine on behalf of McCochy.

S.Ct. 1695, 164 L.Ed.2d 441 (2006) ("[A]ction colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway."); *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. 568.

The district court concluded that the "Defendants have not presented evidence demonstrating, beyond a genuine issue, that they would have engaged in identical conduct even in the absence of the activities on which the [Meadowses'] First Amendment claim is based." However, this conclusion was based upon the false premise that the Defendants have never subjected another installer to an administrative hearing. Further, the district court erred by applying "the same liberal standard" for prima facie causal-connection at the burden-shifting stage. Drawing on case law from the law-enforcement context, we conclude that the proper analysis at the burden-shifting stage of this regulatory-enforcement case would focus on whether the Defendants had probable cause to bring an administrative proceeding against Berry Meadows. *Hartman*, 547 U.S. at 252, 126 S.Ct. 1695 (requiring First Amendment retaliatory-prosecution plaintiff to "allege[ ] and prove[ ]" the absence of probable cause); *Barnes v. Wright*, 449 F.3d 709, 719–20 (2006).[7]

In *Hartman*, the Supreme Court held that, where a plaintiff brings a First Amendment retaliation claim against a defendant for inducing a prosecutor to bring charges, the plaintiff must plead and prove the absence of probable cause for the prosecution. 547 U.S. at 266, 126 S.Ct. 1695.

Demonstrating that there was no probable cause for the underlying criminal charge will tend to reinforce the retaliation evidence and show that retaliation was the but-for basis for instigating the prosecution, while establishing the existence of probable cause will suggest that prosecution would have occurred even without a retaliatory motive.

*Id.* at 261, 126 S.Ct. 1695. The Court noted in dicta that, if the defendant directly brought charges, the plaintiff would not bear the burden of proof, but "litigating probable cause will [still] be highly likely in any retaliatory-prosecution case, owing to its powerful evidentiary significance." *Ibid.* In *Barnes v. Wright*, we held that Hartman's "rule sweeps broadly" and granted qualified immunity to law-enforcement defendants who directly initiated a grand-jury proceeding against the plaintiff because the defendants demonstrated probable cause. 449 F.3d 709, 719–20 (2006). This is because the highly probative value of probable cause establishes a presumption that the proceeding "would have occurred even without a retaliatory motive." *Hartman,* 547 U.S. at 261, 126 S.Ct. 1695. This case concerns an alleged retaliatory regulatory-enforcement proceeding, rather than an alleged retaliatory law-enforcement proceeding. But the highly probative value of probable cause does not change. Law-enforcement officials are duty-bound to bring criminal charges against individuals who violate the criminal code, and regulators are similarly bound to bring administrative actions against individuals who violate the administrative code. Qualified immunity shields both from liability for performing their

---

7. As the *Barnes* court noted, in contrast to several other circuits "our precedents [had] not require[d plaintiffs] to prove a lack of probable cause in order to go forward with [a] First Amendment retaliation claim," *Barnes*, 449 F.3d at 718–19, but the Supreme Court in *Hartman* "resolve[d] this split," *id.* at 719. Thus, the presence of probable cause for law-enforcement officers to bring a grand-jury proceeding foreclosed Barnes's First Amendment retaliation claim, which "faile[d] as a matter of law." *Id.* at 720.

duty to take action against persons who they have probable cause to believe committed a violation.[8]

■ The Defendants in this case initiated a regulatory-enforcement proceeding against Berry Meadows, charging him with numerous violations of the Ohio Administrative Code. Public records indicate that the Defendants brought similar charges against septic installers who they believe to have committed violations, and the Meadowses do not dispute this on appeal. Like Barnes, the Defendants directly initiated the hearing, and a probable-cause determination would be highly probative as to whether the hearing "would have occurred even without a retaliatory motive."

The Defendants point to ample evidence supporting their belief that Berry Meadows violated the Ohio Administrative Code. Between 2011 and 2012, numerous customers complained about Digging Dirt's defective and unethical services, including accepting partial payment and then refusing to perform work. Some of these complaints were sufficiently serious to convince a prosecutor to bring criminal charges. There were a large number of malfunctioning septic systems in Trumbull County during this time, and the Health Department asked the OEPA to investigate. The OEPA investigation concluded that improper installation was responsible for the malfunctions and identified Berry Meadows by name as both the installer who was responsible for the most number of defective installations and the installer who had the highest rate of defective installations at 7 out of 11. Nothing in the record indicates that the consumer complaints or the OEPA report were fabricated to manufacture to probable cause or that the Defendants had any reason to doubt their veracity.

The Meadowses point to Enyeart's decision to halt the hearing as evidence of pretext, arguing that, "[i]f Enyeart honestly believed that Berry Meadowses was not fit to install septic tanks, he would not have abandoned his effort to 'protect' the citizens of Trumbull County simply because that endeavor became more difficult and more costly than he anticipated." Appellants' Br. at 48–49. But subjective intent behind an official's conduct is not relevant on the specific question of qualified immunity. Harlow v. Fitzgerald, 457 U.S. 800, 817, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); Crawford–El, 523 U.S. at 588, 118 S.Ct. 1584 ("[A] defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated."). This is true even if—as is the case in First Amendment retaliation actions—improper motive was an element of a prima facie case. See ibid. ("[A]lthough evidence of improper motive is irrelevant on the issue of qualified immunity, it may be an essential component of the plaintiff's affirmative case."). We instead focus only on whether the official's action was objectively reasonable. Harlow, 457 U.S. at 819, 102 S.Ct. 2727. It is objectively reasonable for a health regulator to bring an administrative hearing against a regulated individual where there is sufficient evidence to give the regulator probable cause to believe that the individual has violated the health code.

Numerous consumer complaints and the OEPA investigation gave the Defendants probable cause to believe that Berry

---

8. We note that probable cause alone may be insufficient to shield an official from First Amendment retaliation liability where there is strong evidence that the officer or official seldom or never brought enforcement actions against others with comparable probable cause. But there is no such evidence here.

Meadows violated the Ohio Administrative Code. The existence of probable cause—particularly when combined with evidence of consistent enforcement against other suspected violators—establishes, at the burden-shifting stage, that the Defendants would have brought an administrative hearing against Berry Meadows even if he and his wife had not made any critical remarks against the Defendants. Accordingly, the Meadowses' First Amendment retaliation claim fails, and the Defendants are entitled to qualified immunity.

## III. Conclusion

Government regulators—whether Federal, state, or local—often annoy regulated parties. Regulated parties have a perfect right, under the First Amendment, to oppose, demean, and belittle the regulators. And, under our precedent, they have a right to be free from retaliation for expressing their opinions, however vigorously. At the same time, regulators cannot be hauled into federal court as civil-rights violators whenever a regulated party objects to the regulatory process to which he is subject. This litigation requires us to reconcile these two obvious-sounding principles.

Government employees who have private legal disputes with citizens, even if in some sense growing out of their government activities, may defend themselves just as any citizen might. If a regulator thinks that his landlord is squeezing him to pay rent because of a political disagreement, the regulator can bring an action in landlord-tenant court; if a regulator thinks that vandals defaced his property with political slogans, he can bring a tort suit. And, as in our case, if a regulator thinks that a political opponent has defamed him, giving rise to a private right of redress, he is free to take private legal action, with or without a lawyer, to vindicate his private rights. Such action is not undertaken under the color of state law. We therefore REVERSE the district court's holding that threatening private legal action can be the basis of a § 1983 claim.

The case of regulatory enforcement is somewhat more difficult. If there is cause for regulatory enforcement, a diligent public employee will seek such enforcement, whether or not he has a private dispute with the regulated party. But he cannot bring an enforcement action simply to harass or oppress a citizen for his political beliefs and expression, including the expression of hostility toward the regulator. So we ask whether there is sufficient evidence to raise a genuine issue that the regulatory-enforcement action would not have been brought absent personal animus towards the hostile expression. In this case, there is abundant evidence that the Meadowses' septic operation had created conditions well within the range of those that led to enforcement actions against others. And the Meadowses present no evidence, other than Berry Meadows's own asserted memory and belief, to contradict the documentary evidence. Accordingly, we REVERSE the district court's denial of qualified immunity.

KAREN NELSON MOORE, Circuit Judge, dissenting in part.

I agree with the majority's conclusion that the Meadowses have established a prima facie case of First Amendment retaliation. They have shown constitutionally protected speech or conduct, adverse action by defendants, and a causal connection, *i.e.,* "the adverse action was motivated at least in part by [the] protected conduct." *Dye v. Office of the Racing Comm'n,* 702 F.3d 286, 294 (6th Cir.2012) (internal quotation marks omitted).

I differ from the majority with respect to the next analytical step. The law is

clear that "[i]f the plaintiff establishes this prima facie case, the defendants can avoid liability by showing that they would have taken the same action even in the absence of the protected conduct." *Wenk v. O'Reilly*, 783 F.3d 585, 593 (6th Cir.2015) (internal quotation marks and alteration omitted). Then "summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Dye*, 702 F.3d at 294–95 (internal quotation marks omitted).

Here, the Meadowses have produced sufficient evidence from which a reasonable jury could conclude that Enyeart and Migliozzi retaliated against the Meadowses at least in part because of their protected activity, by subjecting Berry Meadows to a civil permit-review hearing that delayed his permit's renewal and then by halting the hearing mid-stream. The Meadowses produced evidence that not only did Enyeart halt the permit-review hearing, but also the hearing administrator actually found (1) that the Notice of Violation did not provide the Meadowses with sufficient notice of the alleged violations, R. 95–1 at 33–34 (Hr'g Officer's Report) (Page ID # 1841–42); (2) that "the Board presented no evidence to prove the allegations" in the Notice of Violation, *id.* at 35 (Page ID # 1843); (3) that the Board had not provided the Meadowses with an "opportunity to testify at the Hearing," *id.* at 34 (Page ID # 1842); and (4) "that the failure to permit [the Meadowses] to present testimony and documentary evidence at this Hearing was a denial of due process, in violation of their rights to a fair hearing under federal and Ohio law," *id.* at 36

---

1. This particular claim does not involve a criminal prosecution, so probable cause is not the pertinent standard. *See Hartman v. Moore*, 547 U.S. 250, 265–66, 126 S.Ct. 1695,

(Page ID # 1844). Under these circumstances there is a genuine issue of material fact whether Defendants would have undertaken the same actions absent the Meadowses' protected activity. Therefore, I would affirm the district court's denial of qualified immunity regarding the First Amendment retaliation claim based upon Defendants subjecting Berry Meadows to a civil administrative hearing that delayed his permit's renewal.[1]

164 L.Ed.2d 441 (2006) (applying probable-cause analysis when addressing claim that criminal prosecution was retaliatory).