DISSENT
CLAY, Circuit-Judge,
dissenting.
This' case turns on whether the officer and the county had a penological justification for strip searching Plaintiff in a group with other' inmates. The entire majority opinion is predicated on the officer’s ambiguous and generalized testimony that there was an urgent situation which necessitated the group strip searches. There is no basis in the record indicating that every time Plaintiff was strip searched in a group, there was a special circumstance at that time. The majority thus incorrectly holds that Defendant Terri Graham is entitled to qualified immunity and that Plaintiff failed to successfully defend her municipal liability claim in connection with the cellblock search. The law clearly establishes that the three group strip searches conducted in the Registry of the Wayne County Jail and the strip search conducted in the cellblock violated Plaintiffs constitutional rights. Plaintiff also persuasively presented her municipal liability claims in connection with the four strip searches.
For the reasons stated below, I respectfully disagree with the majority opinion and would remand for further proceedings consistent with this dissent-and direct the district court to consider the viability of Plaintiffs request for class action designation.
BACKGROUND
Because the majority fails .to mention many of the facts reflected by the record and as testified to by Plaintiff; the record needs to be reviewed in order to provide the factual context for the events giving rise to Plaintiffs claims.
On August 2, 2012, Plaintiff was involved in 'a -car accident and three ■ of her close friends were seriously injured. (R. 44, Defs.’ Mot. for Summary Judgrhent, Page ID # 1455.) Plaintiff had graduated high school a year prior to the accident and planned to attend college to be a graphic designer. (R. 44-2, PL’s Dep. Tr., Page ID # 1490-91.) On October 9, 2012, Plaintiff was arrested .and charged with reckless driving in connection with the August 2, 2012 accident. (Id.) Immediately following her arrest, Plaintiff was housed as an inmate in the Wayne County Jail from October 9, 2012, through November 13, 2012. (R. 1, Compl., Page ID # 2.) Prior to her car accident, Plaintiff had never been incarcerated in jail: (R. 44-2 at 1511.)
During her 34-day stay at the county jail, Plaintiff was strip searched at least four separate times. (R. 44-2 at 1499, 15,01.) Plaintiff was strip searched three times in the Registry, which is an intake area where the inmates change out of their street clothes into the clothes provided by the jail. (Id. at 1499.) Plaintiff testified that when she was strip searched in the Registry, Graham, a female officer, conducted the search and there were at most five *493 other female inmates in the room -with her each time. (Id.) The Registry room had a wall that was separated by glass. (Id. at 1500.) Graham was inside the room with the inmates, and another female officer was on the other side of the glass. (Id.)
Although the male officers did not enter the room during these three searches in the Registry, Plaintiff was able to hear male voices coming from behind the glass on the other side of the wall of the Registry. (Id.) The voices conveyed to Plaintiff the impression that she was being viewed by the males on the other side of the glass. In questioning Plaintiff about the male voices she heard, Defendants sought to have Plaintiff admit that those voices could have been coming from a room from which Plaintiff would not have been viewed while she was being strip searched. (Id.) At the very least, a factual dispute exists as to whether the jail permitted Plaintiff to be viewed by male officers during the three strip searches.
During the searches in the Registry, Graham criticized Plaintiffs body odor and cleanliness. Graham deliberately humiliated Plaintiff by telling her that, she smells like a “funky monkey” and that Plaintiff needed to clean herself better. (Id.) Graham also handled those female inmates who were menstruating in a way potentially hazardous for their health. Plaintiff witnessed female inmates being strip searched while on their monthly cycle, and described how menstrual fluid was discarded on the floor in the Registry, which nobody attempted to clean up. (Id. at 1505, 1512.) Plaintiff further testified that Graham would also light candles and incense due to the alleged smell caused by the female inmates who were strip searched. (Id. at 1500.)
In October 2012, the fourth search occurred in the unit where the inmates at the county jail are housed. (Id.) These searches of the housing units, or cellhlocks, are conducted to search for contraband. (Id. at 1502.) First, the individual cells are searched. (Id.) Then, once the cells have been searched, the inmates are ordered out of their cells to form a line along the floor in the common area. (Id.) The common area is the area with tables, chairs, and a television in the middle of the floor where the housing units are located. (Id.) Also on this floor is an area called .the “bubble” or duty station, where the officers stand in order to view the cells and common area on the floor. (Id. at 1502-03.) There is a tinted glass screen around the bubble through which the officers can see. (Id. at 1504.)
During this fourth search, Plaintiff was ordered to stand in line in front of the cells with the other female inmates on her floor. (Id. at 1503.) The women were then told to take off each piece of their clothing, shake the clothing out, lift their breasts, hold out their arms, squat, and cough. (Id. at 1502.) A female officer was involved in supervising this strip search. Plaintiff testified that there were three male officers, and one female officer, standing in the bubble during the strip search. (Id. at 1503.) Although Plaintiff could not see the male officers’ faces because of the tint on the glass screen, she knew they were men because she heard male voices and saw silhouettes of “three buff male officers” standing inside the bubble. (Id. at 1504.) Plaintiff saw the male silhouettes facing in her direction and presumably viewing her and the scene in front of them. (Id. at 1505.)
The majority believes that the evidence presented in this case fails to raise a genuine dispute of material fact as to Plaintiffs claims. I disagree. The record lacks any indication that Defendants acted lawfully towards Plaintiff and the other female inmates housed at the county jail. Plaintiff *494 was repeatedly humiliated and embarrassed as a direct result of Defendants’ actions in this case. Although never having been convicted of a crime, at no point during her incarceration was Plaintiff informed of the jail’s policies or protocols regarding strip searches and her rights in connection with such searches. (Id. at 1504-05.) Defendants argue that the record is not sufficient to hold them accountable for their actions, and the majority obviously agrees.
For the reasons that follow, I respectfully dissent.
DISCUSSION
A. Qualified Immunity
Title 42 U.S.C. § 1983 establishes “a cause of action for deprivation under color of state law, of any rights, privileges or immunities secured by the Constitution or laws of the United States.” Horn v. Madison Cty. Fiscal Court, 22 F.3d 653, 656 (6th Cir. 1994). To succeed on this claim, a plaintiff must show “(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law.” Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009) (quoting Sigley v. City of Parma Heights, 437 F.3d 527, 533 (6th Cir. 2006)). However, “[t]he doctrine of qualified immunity protects government officials ‘from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.’ ” Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).
“[Wjhether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the ‘objective legal reasonableness’ of the action,” “assessed in light of the legal rules that were ‘clearly established’ at the time it was taken.” Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (citation omitted). To determine whether a government official is entitled to qualified immunity, we apply a two-prong test: (1) whether the facts, when taken in the light most favorable to the party asserting the injury, show the official’s conduct violated a constitutional right; and (2) whether the right violated was clearly established such “that a reasonable official would understand that what he is doing violates that right.” Anderson, 483 U.S. at 640, 107 S.Ct. 3034.
In determining whether a constitutional right was clearly established, “[tjhe key determination is whether a defendant moving for summary judgment on qualified immunity grounds was on notice that his alleged actions were unconstitutional.” Grawey v. Drury, 567 F.3d 302, 313 (6th Cir. 2009). “Qualified immunity ordinarily applies unless it is obvious that no reasonably competent official would have concluded that the actions taken were unlawful.” Chappell v. City of Cleveland, 585 F.3d 901, 907 (6th Cir. 2009) (citation omitted).
The Supreme Court has admonished that in most situations, prison officials “should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.” Bell v. Wolfish, 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). “To ensure that courts afford appropriate deference to prison officials, [the Supreme Court] ha[s] determined that prison regulations alleged to infringe constitutional rights are judged under a ‘reasonableness’ *495 test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights.” O’Lone v. Estate of Shabazz, 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).
The Supreme Court has articulated the following standard: “[Wjhen a prison regulation impinges on inmates’ constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.” Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2264, 96 L.Ed.2d 64 (1987). A correctional officer’s discretionary actions are reviewed under the same deferential standard. Florence v. Bd. of Chosen Freeholders of Cty. of Burlington, 566 U.S. 318, 326, 132 S.Ct. 1510, 182 L.Ed.2d 566 (2012). Despite the deference given to prison official’s actions, the Supreme Court has instructed that “federal courts must take cognizance of the valid constitutional claims of prison inmates.” Turner, 482 U.S. at 84, 107 S.Ct. 2254.
The Supreme Court advises the federal courts that, where a prisoner alleges an unconstitutional search,
[tjhe test of reasonableness under the Fourth Amendment.... requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.
Bell, 441 U.S. at 559, 99 S.Ct. 1861.
In other words, we first examine “the scope, manner, and location of the search — as well as the justification for initiating it — in order to assess the degree to which it invaded the prisoner’s right to privacy.” Stoudemire v. Mich. Dep’t of Corr., 705 F.3d 560, 572 (6th Cir. 2013). Next, we “evaluate the need for the search, giving due deference to the correctional officer’s exercise of her discretionary functions.” Id. Lastly, we “determine whether the search was reasonably related to legitimate penological interests by weighing the need against the invasion.” Id.
First and foremost, the record in this case and our jurisprudence clearly demonstrate that the three strip searches conducted in the Registry violated Plaintiffs constitutional rights. The penological justification given by Graham fails to outweigh the invasion of Plaintiffs privacy rights. Jail personnel must be held to a certain standard of human decency and civility. Although detainees, otherwise known as inmates, enjoy less privacy rights than non-detainees, they still have privacy rights. Cornwell v. Dahlberg, 963 F.2d 912, 916 (6th Cir. 1992) (“[A] convicted prisoner maintains some reasonable expectations of privacy while in prison ... even though those privacy rights may be less than those enjoyed by non-prisoners.”).
We held that it was clearly established at least since 2007 “that strip searches performed in view of other inmates without a legitimate penological justification violates inmates’ clearly established Fourth Amendment rights.” Salem v. Mich. Dep’t of Corr., 643 Fed.Appx. 526, 530 (6th Cir. 2016); see also Amaechi v. West, 237 F.3d 356, 364 (4th Cir. 2001), and Iskander v. Village of Forest Park, 690 F.2d 126, 129 (7th Cir. 1982). We held in Stoudemire, that although an officer may have a valid reason for searching an inmate, “no special circumstances provided additional justifications for strip searching Stoudemire where others could see her naked.” 705 F.3d at 573-74. In Williams v. City of Cleveland, we reiterated the ruling in Stoudemire that there needs to be “exigent circumstances” compelling the officer to strip search an inmate in view of other inmates. 771 F.3d 945, 955-56 (6th Cir. 2014).
*496 In this case, Graham would have been justified in strip searching Plaintiff one-on-one in order to search her for contraband when she initially entered the jail and when she left and came back from court appearances. However, Graham’s justification for strip searching Plaintiff as a part of a group must be akin to an emergency in order to satisfy the Fourth Amendment’s prohibition on warrantless searches. Stoudemire, 705 F.3d at 574 (finding that “no emergency made such a search necessary.... [because] there were no time or resource constraints that supported the need for such a[] [public] search”). Graham’s justification for strip searching Plaintiff in a group setting on a number of occasions was not akin to an emergency. Graham justified her actions by claiming that there was an influx of 20 to 25 inmates that needed to be processed before the end of the day, otherwise— according to Graham — those inmates with medical cards would have to wait overnight to be seen by a medical professional. At this early stage of the litigation, Plaintiff has had little opportunity to verify Graham’s self-interested assertions with ■ regard to the justification for the jail’s procedures — which in this case would involve reviewing the availability of the jail’s personnel and funding resources for the conduct of strip searches.
Graham cannot justify group strip searches such as those to which Plaintiff was subjected merely because there were some female inmates who may or may not have been found to need immediate medical treatment. One of the reasons why this processing of inmates was not akin to an emergency , is because this influx of 20 to 25 inmates was not something that happens once in a while. Plaintiff was subject to three group strip searches in the Registry over the course of her brief 34-day stay at the county jail. At a minimum, this non-exigent situation could be anticipated -and planned for in advance by the proper allocation of county resources. By the county’s own reckoning, this circumstance occurred once every ten days.
The frequency of this ’occurrence mitigates against characterizing the influx of inmates as “special,” “akin to an emergency,” or “exigent,” It is extremely unlikely that there were special,. exigent, or emergency-like circumstances every time the officer publicly and openly strip searched Plaintiff in a group in the Registry. The reason: given by the officer- was not so much about a special circumstance, but concerned a regular, occurrence at the jail. Arguably, the jail is always going to have an- influx of inmates needing to be processed. The officer testified that the reason she would strip- search the women in groups was because “if we have to search them one at a time, it takes a long time.” (R. 44-4, Graham Dep., Page ID # 38 (testifying that the average number of female inmates to be processed each day might be 20 or 25, which therefore suggests that this “influx” of inmates did not occur infrequently but rather all the time).) A possible explanation for the group strip search procedure is that Graham and other jail personnel resorted to the procedure not out of- necessity, but because they desired to conduct the strip searches quickly to accommodate their own personal convenience.
The proper course ■ of action Graham should have taken during these alleged “influxes”.would have been to process and strip search those inmates with medical cards first, and one at a time, before processing the inmates without medical cards. Graham even testified that the medical cards, or medical flags, are usually given before the strip searches occur. Thus, Graham would know prior to. conducting the strip searches which inmates needed to immediately see a medical professional and *497 which inmates did not. This proposed system of prioritizing those with medical cards first is one way that would have solved Graham’s problem without violating any inmate’s constitutional rights. The majority undiscerningly accepts Graham’s justification without considering less intrusive and offensive means by which the female inmates could have been processed. Such shocking and opprobrious searches of a person’s most intimate body parts in front of on-lookers with a blanket explanation that whenever the county jail has to process a lot of female inmates, they can be publicly strip searched in groups, cannot be justified. Stoudemire and Williams both emphasize that these circumstances need to be “special,” or “exigent,” and “akin to an emergency.” As discussed above, all three of these circumstances are lacking in this case.
The majority also fails to construe all reasonable inferences from the evidence in the light most favorable to Plaintiff as the non-moving party. See Ciminillo v. Streicher, 434 F.3d 461, 464 (6th Cir. 2006). The evidence as recited by the majority paints a picture at odds with the actual events that transpired in this case. The majority fails to mention that the group strip searches were not authorized by any policy the county jail affirmatively approved, nor were the searches carried out in an objective way. Graham admits in her testimony that the reason she searched inmates in groups of 5 rather than in groups of 6 or 7 was due, in part, to the 5:1 ratio for “transporting” prisoners. (R. 44-4 at 1538.) She also admits that there was no policy approving of group strip searches, and that the number 5 is something that she arbitrarily came up with herself. (Id.) The takeaway from the officer’s testimony is simple: the group strip searches Plaintiff endured were carried out according to the subjective and arbitrary whims of the officer on duty at the time. This part of Graham’s testimony, which the majority conveniently fails to mention, should be reason enough for us to find that the group strip searches endured by Plaintiff were unconstitutional.
Graham also testified that in late 2013, she received a directive which clarified the strip search policy for jail personnel. The November 2013 directive circulated by the county jail management instructed all jail personnel to strip search female inmates “one inmate at a time in the dress room” by an officer of the same gender and out of view of persons of the opposite gender. (See R. 44-6, Wayne County Divisional Directive,' Page ID # 1557.) The directive also instructed the jail personnel to “be professional at all times.” (Id.) The directive fails to specify appropriate circumstances under which jail personnel are permitted to depart from the policies. This directive is especially relevant to our analysis because of what it says and when it was circulated. In August 2012, a few months prior to the circulation of the directive, a female inmate filed an action against the Wayne County Jail, alleging claims of group strip searches being conducted, similar to Plaintiffs, in a humiliating and derogatory manner, sometimes in the presence of male officers. The fact that the directive was circulated to all jail personnel, and that it specifically emphasized how jail personnel are not- to strip search female inmates in groups, supports Plaintiffs contention that such group strip searches are unconstitutional and contrary to the jail’s policy. The timing of when the directive was circulated also supports the contention that the group strip searches were not only inappropriate and against jail policy, but would not be tolerated by the jail administration. Whether or not group strip searches were actually against the. jail’s policy at the time she was strip searched, Plaintiff nevertheless has a via *498 ble claim. This is evidence that the majority omits from its analysis.
Additionally, there is evidence in the record that even the person in charge of managing the intake process at the county jail was unaware, and shocked to discover, that officers were conducting group strip searches of female inmates. Jeriel Heard, Director of Population Management at the Wayne County Jail, testified that he was not aware that female inmates were openly strip searched in groups. (R. 44-8, Jeriel Heard Dep., Page ID # 97-98.) He stated that:
Officers get caught up in the exigency of dealing with ... 25 [inmates]. Sometimes we have booked in 40 to 50 females in a day, and we have two female officers there.
So, you know, that is the reason, you know, that you have to reiterate directives and policies because officers will feel under duress or stress and do things that they are — they know they shouldn’t be doing. And, first of all, it’s not safe for them to do it. I mean, I would object because I wouldn’t want one officer to be strip searching five inmates at the same time.
(Id. at 98.)
Heard’s testimony clearly demonstrates that Graham conducted the group strip searches in contravention of the jail’s policy and in a manner that put the officer’s and inmates’ safety at risk. The officer responsible for processing female inmates into the jail required a more compelling justification for strip searching female inmates in groups other than that it would take less time. There were other, less intrusive solutions to the officer’s concern for efficiency that would have been consistent with our jurisprudence on this issue.
Graham provides little evidence demonstrating that every time she strip searched Plaintiff in a group, there was an exigent circumstance at that time. The evidence presented by Graham is ambiguous and generalized, and not specific as to what happened on those specific dates. Heard and Graham only testified to the intake process at the jail in general and the estimated number of inmates that would have caused the purported influx. We still do not know, on those days Plaintiff was strip searched, whether the number of inmates that needed to be processed reached 20 to 25. The officer’s justification, or lack thereof, is not sufficient to indicate a special, exigent, or emergency circumstance necessitating group strip searches.
Graham further testified that the “ripple effect” of conducting individual strip searches is that “sometimes [the female inmates] get left over to midnight shift,” and inmates who cannot get processed in the afternoon shift are processed during the next shift, or midnight shift. (R. 44-4 at 76.) Thus, the amount of time that an inmate would be waiting to get processed could be a difference of hours. There is no indication, nor has any evidence been provided by Graham, that such a delay would have subjected any of the inmates being processed to a health risk.
The issue as the majority frames it is whether our cases clearly establish that a group strip search conducted to expedite access to medical treatment violates the Fourth Amendment. However, that is definitively not the issue in this case. Rather, the true issue is whether the justification provided by Graham sufficiently demonstrates a special, exigent, or emergency circumstance which necessitated that such an invasive and humiliating jail intake process be conducted in the presence of others who had no reason to view such *499 things.[1]
' Furthermore,’ the majority’s interpretation of the relevant case law on this issue is completely flawed. In Stoudemire, we considered, along with numerous other factors, the lack of evidence of any time constraints justifying the need for the public strip search. 705 F.3d at 574. This finding, however, does not render Stoudemire inapplicable for purposes of our determination in this case. Stoudemire emphasizes a key point, which is that the test for analyzing prison inmate searches is a balancing test, and “not capable of ... mechanical application” as suggested by .the majority opinion. Bell, 441 U.S. at 559, 99 S.Ct. 1861. The lack of time constraints in Stoudemire does not make it irrelevant for our purposes. The point is that it does not appear that the officer in this ease was under any emergency-like time constraints during any of the particular searches -in the Registry; certainly, the record below fails to indicate any such time constraints. Thus, like Stoudemire, this factor weighs in favor of Plaintiff.
Stoudemire also supports Plaintiffs argument given the scant documentation of the alleged “exigent circumstance” offered by Graham. The exigent circumstance, as argued by the officer, is that the inmates needed to be speedily strip searched so that they could be provided medical treatment as soon as possible. Despite Graham’s assertion, she has not provided sufficient evidence as to why there was such an “exigent circumstance” at the time the group strip searches. were performed on Plaintiff. It is clear from Graham’s and Heard’s testimony that the group strip searches-in the Registry were not conducted in accordance with the jail’s policy, and that they were likely -conducted in accordance with Graham’s personal preferences or to suit her -personal convenience. Additionally, Graham is not clear as to the •specifics surrounding the three Registry group strip searches. In Stoudemire, the search and the specifics surrounding that particular search were clearly documented by sufficient evidence in the record. It was clear in Stoudemire that the jail personnel had no special time constraints or other justifications for - conducting the strip search in view of the other inmates. Conversely, the record in this case is bereft of the details surrounding the three Registry group strip searches. In Bell, the Supreme Court explicitly stated that the courts are tasked with the responsibility to determine “the need for the particular search” at issue. 441 U.S. at 559, 99 S.Ct. 1861 (emphasis added). We are unable to do that in this ease.with the deficient record presented to us on appeal.
Despite the majority’s claim, Williams also offers guidance for our determination. In Williams, we held that the plaintiffs’ claims involving group strip searches should survive the defendant’s motion to dismiss. Although Williams did not involve a motion for summary judgment, we nevertheless asserted propositions of law regarding the justification the defendant provided at the time. We stated in Williams that “[gjiven the significant incursion into plaintiffs’ privacy rights -caused by the jail’s preferred method .of searching and *500 delousing [plaintiffs], the jail’s need to perform the searches in this particular manner must be unusually dire before it can outbalance the affront to plaintiffs’privacy.” 771 F.3d at 954. In response to the defendant’s purported justification for. delousing the plaintiffs’ genitals with a spraying ' agent, we stated that “there is no question that permitting self-application of the delousing solution would be less humiliating and invasive than the ‘hose treatment.’” Id. at 955. Similar to Williams, there is no question that prioritizing-the inmates in need of medical care with medical cards ahead of the other inmates would have solved Graham’s alleged timing problem, and more importantly, would have been significantly less intrusive and embarrassing than the group strip searches.
Likewise, our decision in Dufrin v. Spreen supports Plaintiffs proposition that Graham conducted unconstitutional strip searches and that Graham was on notice when she conducted the searches that such group strip searches were unconstitutional. 712 F.2d 1084, 1089 (6th Cir. 1983). In Dufrin, we held that the strip search of an inmate was not unconstitutionally invasive because “the search actually conducted was visual only, and was carried out discreetly and in privacy.” 712 F.2d at 1089. Specifically, we concluded that the strip search in Dufrin was not unconstitutionally invasive because it was visual only, conducted by a female attendant, “was conducted in the privacy of a room in which only the jail matron could observe the prisoner.... [and] [t]here [wa]s no claim of offensive behavior on the part of the matron or of anyone else in connection with the search, beyond'that inherent in the nature of the inspection itself.” Id. at 1087.
The strip search at issue in Dufrin was a proper example of a constitutional strip search because the inmate was searched in private, without onlookers, and was conducted without the officer making offensive and harassing comments. Graham did not conduct the search in the manner outlined by our decision in Dufrin even though she was on notice that such outrageous and offensive conduct would not be tolerated. Graham strip searched Plaintiff in view of numerous other female inmates and made offensive and- harassing comments about Plaintiffs alleged smell and lack of cleanliness, and used the derogative tern “funky monkey” to describe Plaintiff. Although Graham’s offensive and insulting remarks do not render the strip search per se unconstitutional, “see Roden v. Sowders, 84 Fed.Appx. 611, 613 (6th Cir. 2003) (‘Even if [the prison officer] did laugh, the strip search is not rendered constitutionally invalid thereby[,]’), the comments may, in context, suggest personal animus and implicate the dignitary interest ‘inherent in the privacy component of the Fourth Amendment’s proscription against unreasonable searches,’” Stoudemire, 705 F.3d at 573 (quoting Brannum v. Overton Cty. Sch. Bd., 516 F.3d 489, 499 (6th Cir. 2008)).
Because the three Registry group strip searches violated Plaintiffs clearly established Fourth Amendment rights, I would hold that Graham is not entitled to qualified immunity.
Furthermore, Plaintiffs claim that Defendants violated her constitutional rights by forcibly exposing her to male officers while she was being strip searched in the cellblock should have survived summary judgment. At the very least, a factual dispute exists as to whether the jail permitted Plaintiff to be viewed by male officers during the cellblock. search. Plaintiff presented evidence, which Defendants failed to rebut, that demonstrated at least three male officers viewed her while she was being strip searched in the cellblock.
*501 Our precedent clearly establishes that an inmate has a valid Fourth Amendment privacy claim when he or she alleges that members of the opposite sex viewed them during a strip search without a penological justification. See Cornwell, 963 F.2d at 916. Plaintiff noted in her response to the mo-, tion for summary judgment that “Defendants are not seeking summary judgment as to Plaintiffs claims that her strip search, in the presence of members of opposite sex, was a violation of her Fourth Amendment rights.” (R. 49 at 1614 n.l.) The majority briefly addressed this claim and held that Plaintiff was mistaken to have thought Defendants were not challenging this claim. The majority misinterprets the record. With regard to Plaintiffs individual constitutional claims, Defendants only challenged Plaintiffs claim in connection with the three group strip searches in the Registry. (See R. 44 at 1461 (listing the statement of the issues and only challenging one of Plaintiffs individual constitutional claims — the group strip search claim in the Registry).) Thus, Plaintiff was correct in stating that Defendants did not challenge this claim in -their summary judgment motion.
The majority also contends that Plaintiff has no individual claim regarding the cell-block search because she failed to sue an officer other than Graham in their individual capacity for partaking in this search. The majority fails to view this claim in its proper context. Plaintiff was incapable of recalling the names of the male officers that viewed her that day because their identities were concealed behind the tinted glass in the bubble. Not unless every male officer who worked that day was deposed and the officers who viewed her admitted to such conduct would Plaintiff have been able to name the officers individually in her complaint. Additionally, Plaintiff was not given the opportunity to amend her complaint to address this issue. Discovery on this issue was thus insufficient. It would therefore be beneficial to remand the case in order to give Plaintiff an opportunity to conduct more discovery so she can identify the individual officers, both male and female, who were involved in the cellblock search. In this regard, the district court should be instructed on remand to permit the parties to address the issue of whether discovery should be reopened for purposes of identifying both the female officers who conducted the cellblock strip search and allowed the male officers to view the female inmates, as well as the male officers who viewed the cellblock search.
Because the cellblock group strip search violated Plaintiffs clearly established Fourth Amendment rights and because Graham failed to challenge this claim on summary judgment, I would hold that Graham is not entitled to qualified immunity. I would instruct the district court on remand to allow Plaintiff an opportunity to amend the complaint to permit further discovery to be conducted on this claim.
B. Municipal Liability
Also problematic is the majority’s holding that Plaintiffs municipal liability claim fails because she failed to incorporate the other inmates’ affidavits in connection with her cellblock strip search claim. The district court granted summary judgment in favor of the county on Plaintiffs municipal liability claim because it determined that Plaintiff could not demonstrate that the county’s policy was responsible for male officers viewing her unclothed and other female inmates being strip searched in the cellblock. (R. 68, District Court Op’n, Page ID # 1715-16.) The district court specifically held that because Plaintiff alleged only one instance in the cellblock where male officers allegedly viewed her while she was being strip searched, her municipal liability claim must fail. (Id.) The ma *502 jority agrees with the district court’s rationale and further adds that Plaintiff failed to mention the cellblock municipal liability claim at all in her response to the motion for summary judgment. The majority insists that Plaintiff only mentioned her municipal liability claim as it relates to the group strip searches in the Registry, not the cellblock, and that this mention was brief and failed to include the other inmates’ affidavits.
The majority has again improperly framed the issue. Plaintiff properly defended her municipal liability claim as it relates to the cellblock search. Plaintiff argued in her response to the motion for summary judgment that “[t]he manner in which Graham conducted these strip searches compels the denial of her claim to qualified immunity, and also supports Plaintiffs Monell claims against Wayne County.” (R. 49, Pl.’s Resp. to Mot. for Summ. J., Page ID # 1621.) Plaintiffs pluralization of “claims” in her response signifies that she was referring to both of her Monell claims as alleged in her complaint: (1) the group strip searches in the Registry; and (2) the cellblock search. The majority failed to acknowledge that Plaintiff alleged numerous grounds for the county’s Monell liability in her complaint, including her cellblock search where male officers inappropriately viewed her.
Even if Plaintiffs cellblock Monell claim could have been more extensively argued in her response to the motion for summary judgment, Plaintiff was certain that male officers were in the bubble viewing her and the other female inmates being strip searched, and alleged as much. There is no evidence in the record that forecloses the possibility that male officers were actually in the bubble. The district court erroneously held that, “[e]ven if plaintiff was searched in the manner alleged in her deposition testimony, a single instance of male deputies being in the duty station during the search is insufficient to establish that Wayne County had a policy or custom of exposing female inmates in a state of undress to male [officers].” (R. 58 at 1715-16.) The majority agreed with the district court.
The majority further added that the district court did not err in deciding not to consider identical allegations in the affidavits from other female inmates because Plaintiff did not bring them to the court’s attention in connection with the cellblock claim. The majority is wrong. In Plaintiffs response to the motion for summary judgment, she expressly stated that she “filed with the Court hundreds of affidavits of inmates testifying as to the unreasonable manner of their strip searches, either in the registry room, or in the presence of men, or both” and that she “relies on, and incorporates herein, the affidavits filed at Docket 30-1 in opposition to summary judgment.” (R. 49 at 1618, n.2.) In this same response, Plaintiff directs the district court’s attention to specific affidavits in the record that recount occasions when male officers were present during their strip searches. (R. 49 at 1620-21.) The affidavits from the other female inmates depict countless occasions where they were forcibly exposed to male officers during strip searches. (See R. 30-1, Affidavits from Similarly Situated Female Inmates.) The district court erred by granting summary judgment in the county’s favor on this claim because Plaintiff expressly directed the district court’s attention to specific affidavits in the record that corroborated Plaintiffs Monell claim that the jail had a policy or custom in practice of forcibly exposing female inmates to male officers during strip searches.
Likewise, Plaintiffs Monell claim as it relates to the group strip searches in the Registry was sufficiently defended in her *503 response to the summary judgment motion. Plaintiff noted in her response that the hundreds of affidavits of female inmates detailing “the unreasonable manner of their strip searches ... in the registry room” support her opposition to the summary judgment motion. (R. 49 at 1618, n.2 (citing to the hundreds of affidavits which detail countless instances of group strip searches).) Thus, Plaintiff properly put forth evidence creating a genuine dispute of a material fact as it relates to her municipal liability claim in connection with the group strip searches in the Registry. This genuine dispute thus forecloses summary judgment in the county’s favor. Even without considering the affidavits of the other female inmates, Plaintiff alone alleged three different instances where she was strip searched in a group.
Thus, I argue that Plaintiff can demonstrate not only an individual constitutional violation as to the group strip searches conducted in the Registry and the strip search conducted in the cellblock, but also a genuine dispute of a material fact in connection with the county’s custom or practice of allowing these group strip searches to occur and forcibly exposing female inmates to male officers during strip searches.
CONCLUSION
As articulated above, the analyses utilized by the majority in connection with its qualified immunity and municipal liability discussions are plainly wrong. Specifically, I disagree with the majority’s holding as it pertains to the finding of qualified immunity for Graham and the finding that Plaintiff failed to raise municipal liability claims against Wayne County. Accordingly, I respectfully dissent and would remand for further proceedings and direct the district court to consider the viability of Plaintiffs request for class action designation.

. With regard to its citation of Wegener v. City of Covington, 933 F.2d 390, 392 (6th Cir. 1991), the majority makes the baffling claim that Plaintiff seeks to misapply the qualified immunity doctrine by seeking to show that the officer’s justification is not clearly established, rather than that Plaintiff’s constitutional right, which was violated, was clearly established. Under many factual scenarios, both issues are bound up together when, by way of example, a plaintiff is able to demonstrate that her clearly established constitutional rights were violated but the accused officer attempts to establish a justification that might arguably excuse the violation.